NELSON P. COHEN
United States Attorney

ROBERT S. ANDERSON
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
Phone: (406) 829-3322
Fax: (406) 542-1476

WAYNE D. HETTENBACH
Trial Attorney,
United States Department of Justice,
Environment and Natural Resources Division,
Phone: (202) 305-0213
Fax: (202) 514-8164

STEVEN E. SKROCKI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALAN J. VEYS and<br>JAMES E. JAIRELL,<br><br>Defendants. | Case No. 1:06-cr-00003-JWS-PMP<br><br>UNITED STATES SENTENCING MEMORANDUM FOR DEFENDANT VEYS |

The United States of America, by and through its attorney, the United States Attorney for the District Court of Alaska, respectfully files its Sentencing Memorandum with respect to defendant Alan J. Veys.

## I. INTRODUCTION AND RELEVANT BACKGROUND

The defendant Veys and his co-defendant Jairell were charged in a 14-count Indictment with conspiring to violate the Lacey Act beginning in about February 2000 and continuing at least through late 2001. Defendant Veys was also charged with substantive violations of the Lacey Act's anti-trafficking and false-labeling provisions during the same period. Defendant Veys, as part of plea agreement, pled guilty to single count information of conspiring with Jairell to violate the Lacey Act from April 2000 to February 2007. The gravamen of these charges, both in the indictment and later information, is the defendants' sale and provision of guiding services to black bear hunters without the involvement of a registered guide, and the subsequent transport of trophy parts of the bears in interstate commerce. The defendants would sell complete package outfitted and guided hunting trips during which the hunters would be housed at Veys' Pybus Point Lodge in Southeast Alaska, and from which the hunts were conducted. These hunts, booked by Veys, were guided by Jairell out of the lodge without the involvement of a registered guide, as required by Alaska state law. The defendants' scheme was facilitated both by their falsification of state application forms for defendant Jairell's Class A Assistant Guide license, and by the falsification of black

bear "sealing" forms submitted to the State which reported that no guiding services were provided on the hunts in question.

The Pre-sentence Report identifies that during the course of this conspiracy, there were 11 hunters who booked the guided hunting trips with Veys and who killed 10 black bears as a result of the defendants' illegal activities. Pre-sentence Report ("PSR") at ¶ 41. The PSR correctly identifies the base offense level as 6, and adds 2 levels because the offense was committed for pecuniary gain. PSR at ¶¶ 47-48. However, the PSR incorrectly applies U.S.S.G. §2Q2.1(b)(3)(A) when it concludes that a four level enhancement is appropriate based upon the value of the wildlife involved in the offense. *See* PSR at ¶49. As explained below, correctly applying §2Q2.1(b)(3)(A) results in a 6 level adjustment, not 4, for a total adjusted offense level of 14. After adjustment for the defendant's acceptance of responsibility, the final offense level would therefore be 12, rather than 10 as found in the PSR.

**II. ARGUMENT**

The appropriate measure of the value of wildlife involved in a Lacey Act offence is the fair market value for that wildlife, not the amount a defendant was actually paid, and not the cost of replacing the wildlife that was taken. Where a Lacey Act offense involves the provision of outfitted guiding services for the taking of wildlife, the cost of the "sale" of the wildlife is the fair market value of these outfitted guiding services. The PSR incorrectly concludes that the fair market value in this case was what the defendants

were actually paid for only a portion of the entire outfitted guiding service that related to the actual hunt itself, rather than what they were paid for the entire outfitting services provided. In this case, the fair market value of the outfitted guiding services offered by the defendants is not difficult to ascertain by looking at the amounts actually paid by the hunters to defendant Veys for the opportunity to take wildlife, and by looking at the amounts that other outfitters charged for providing a hunter with the same opportunity. In this case, the fair market value of guided black bear hunt conducted from field locations in Alaska was approximately $4,000 per hunt, for a total fair market value of approximately $42,000.

**A. Ninth Circuit Case Law Dictates That Fair Market Value for Outfitting And Guiding Services is the Cost Paid for The Opportunity to Take Game With the Assistance of An Outfitter or Guide.**

A person "sells" wildlife in violation of the Lacey act when he provides "guiding, outfitting, or other services" to facilitate the illegal taking of wildlife. 16 U.S.C. §3372(a)(2)(A); *United States v. Fejes*, 232 F.3d 696, 701 (9th Cir. 2000). The commodity being sold is the opportunity to illegally hunt game with the assistance of the outfitter and guide. *United States v. Atkinson*, 966 F.2d 1270, 1273 (9th Cir. 1992); *United States v. Kayser*, 2000 WL 328121 at* 3 (9th Cir. 2000) (unreported). In determining the fair market value of illegal outfitted and guided hunts, the Ninth Circuit has held that the fair market value of such outfitted and guided hunts is the price paid to the outfitter and guide for all the services they provided, not some portion of those

services attributable to illegal take of the wildlife. In the most clear Ninth Circuit interpretation on this issue, the *Atkinson* court was confronted with facts nearly identical to the instant facts. The outfitter in *Atkinson* charged a package fee of $1,500 for the opportunity to hunt for deer in Montana on multi-day hunting expeditions. *Atkinson*, 966 F.2d at 1271. As part of that $1,500 fee, the outfitter provided multiple days of meals for the hunters, lodging for the hunters, and guiding services for the hunters. *Id*. The Court found that the fair market value of each hunt, for both meeting the elements of the offense and for sentencing purposes, was properly calculated using the $1,500 amount that the outfitter charged for all these services. *Id*. at 1276; *accord*, *Kayser*, 2000 WL 328121 at *3.[1] At sentencing, the *Atkinson* Court did not attempt to divide the outfitter's services between "legal" and "illegal" services, nor did it attempt to subtract what the outfitter must have expended for the lodging and other services he afforded his hunters in order to determine the market value of the hunt. Rather, the fair market value for an outfitted and guided hunt, which is what provided the hunter the opportunity to take the illegal wildlife, was the total cost paid by the hunter for all the outfitting and guiding and

---

[1] Though not an issue on appeal, in addition, the outfitter in *Fejes,* 232 F.2d 696, also provided accommodations and meals to the hunters that he outfitted, and the fair market value of the hunts at sentencing was not determined by attempting to subtract the value of these accommodations or other services offered by the defendant in that case.

other services offered by a defendant as part of the opportunity to take the wildlife. *Atkinson*, 966 F.2d at 1273-74.[2]

**B. Veys Was Outfitting for the Opportunity to Hunt Black Bears, All The Hunters Outfitted By Veys Paid Approximately $4,000 for That Opportunity, Other Outfitters Also Charged Similar Amounts, and Therefore, $4,000 is the Appropriate Fair Market Value For Sentencing.**

In the instant case, a preponderance of the evidences establishes that the fair market value of a multi-day outfitted and guided black bear hunt was approximately $4,000. Like the outfitters in *Atkinson*, *Fejes,* and *Kayser*, Veys afforded individuals an opportunity to illegally take black bears on outfitted multi-day hunting expeditions. Like the hunters in the other cases, the Veys hunters were provided accommodation (at Veys' lodge on remote Admiralty Island) from where the hunts were conducted, and Veys provided the hunters food during the outfitted hunt. While the hunters also may have fished when they were not out on hunts, that was not the purpose for which they were being outfitted by Veys, it was not the primary reason they booked the trip with Veys,[3]

---

[2] Similarly, courts have rejected an argument that fair market value is determined by subtracting the expenses incurred in harvesting and selling wildlife or looking at the actual profits a defendant made, but have rather found that an appropriate measure for sentencing purposes is the fair market value of the wildlife irrespective of these considerations. *United States v. Borden,* 10 F.3d 1058, 1063 (4th Cir. 1993) (fair market value of wildlife is not determined by the profits from an illegal activity, but rather is the fair market value of the wildlife at issue in the offense.)

[3] This is true except for the first three hunters charged in the conspiracy, those that hunted on June 3 and 4, 2000. These three individuals had been to Veys' lodge for a fishing trip the year before Veys began offering hunting trips. They came to the lodge again in June 2000 for a week

and the amounts paid for the Veys outfitted trips did not vary substantially from the prices charged by other outfitters for black bear hunts in the area during the relevant time period.

First, both during the time of the conspiracy and continuing after, Veys and Jairell advertised the services being provided as outfitted black bear hunts, and that the price for such hunts was between $4,000 and $4,300. In 2000, in advertising price sheets seized during the investigation, Veys advertised outfitted black bear hunts from the Pybus Point Lodge as costing $4,000. Exhibit A, 2000 Pybus Point Lodge Price Sheet. This price sheet does not include any information about fishing, and clearly advertises the primary service being offered as a black bear hunt. This type of pricing and advertising continued in all the following years. In 2002, the Veys' Pybus Point Lodge advertising and price sheet describes five day Black Bear hunts as costing $4,000. Exhibit B, 2002 Pybus Point Lodge Price Sheet. Again, this document demonstrates that the primary purpose for the outfitting services offered by Veys was to provide the opportunity for a hunter to take a black bear.

---

long fishing trip, and while already there, were offered the opportunity to hunt for two days, and charged an additional $1,500.00, for a total outfitted trip cost of $4,500 per person. These three hunters are different from all the others because first, they were only provided an opportunity to hunt for two days, whereas all the other hunters booked trips for five days hunting. Second, they had already paid for their lodging and meals, which are part of an outfitted hunt, and therefore were not charged a second time. In any event, even if the Court determines that for these hunters, with circumstance unique from all the others, that the fair market value is only $1,500, that determination does not affect the overall sentencing guideline calculation, as discussed below.

After Jairell fraudulently obtained his registered guide license, he continued to advertise and offer fully outfitted black bear hunts for $4,000. In 2003 and 2004, in promotional material seized in this case, Jairell advertises black bear Pybus Point-based lodge hunting trips as costing $4,300. Exhibit C and D, Jairell Advertising Price Sheet for 2003 and 2004. These advertisements note, in parentheses, that the black bear hunts (from Veys' Pybus Point Lodge) may include fishing. *Id*. It is clear from the structure of the advertisement that the buyer is primarily being afforded the opportunity to hunt and to take black bear, and any fishing that is being offered is an added-on incentive to book the trip. These advertised prices in the Veys and Jairell literature for outfitted black bear hunts are consistent with what the probation office determined that the hunters in this case actually paid to Veys for their outfitted trip during the course of the conspiracy. PSR at ¶41. The prices paid by each hunter for their multi-day outfitted hunt, during which some of them also fished, cost between $3,695 and $4,000. *Id.* Since both Veys and Jairell advertised and sold the multi-day outfitted black bear hunts for these amounts, it is reasonable for the Court to look to this information in helping to determine the fair market value of such outfitted hunts.

Significantly, $4,000 is also the appropriate fair market value for outfitted and guided black bear hunts because that is what other outfitters were charging for similar hunts at the time, and all the services offered by Veys were routinely offered by other outfitters as well. The court may use any available information to determine fair market

value, and it is appropriate to also look to what others in the relevant market are paying for similar services. *See United States v. Eyoum*, 84 F3.d 1004, 1007-08 (7th Cir. 1996) (court determined fair market price by looking to prices charges by five other businesses for similar wildlife). Dave and Wanda Helmick ran an Alaska registered guide outfitting service and operated multi-day black bear hunts in 2001 and 2002 in the same area of Alaska. They were interviewed by FWS agents as part of the investigation into Veys and Jairell's illegal activities, and Wanda Helmick has provided FWS records from their business. The Helmicks' outfitted black bear hunts also included both food and lodging accommodations, and the opportunity to fish from the Helmick's boat. The Helmicks' outfitted hunts in 2001 and 2002 cost approximately $4,000 per hunt. For example, according to the Helmicks' records for two hunters in April 2001, Helmick's outfitter records indicated that the Helmicks were paid $4,085 by each hunter. Similarly, an outfitter by the name of Seahook Charters of Alaska, operated by Larry and Shawn Hooton, offers similar multi-day outfitted guided black bear expeditions in the same geographic area for between $3,500 and $4,000 per hunter. Exhibit E, January 2001 Seahook Charters Advertising Price Sheets (outfitted hunting trip costs $3,500); Exhibit F, 2006-07 Seahook Charters Advertising Price Sheets (outfitted hunting trip costs $4,000) . Like the Veys outfitted hunts, these outfitted hunts include lodging, meals, guide services and an opportunity to fish when not hunting. Exhibit E and F at pp. 2-3. Therefore, both the amounts that the hunters paid Veys for the outfitted hunts, and an

examination of the amounts that are charged by other outfitters in the market for similar hunts, reveals that multi-day outfitted black bear hunts routinely include lodging, meals, and an opportunity to fish when not hunting, and that other outfitters charge approximately $4,000 for such hunts.

The PSR erroneously subtracts from the fair market value of the outfitted hunts paid by every hunter the amounts that it attributes to the lodging, meals, and other services, and estimates in most cases that the cost of the five day guided bear hunt itself as only $1,500. The PSR does not explain the reason why it selected this estimated amount as the fair market value for its calculations, and does not respond to the objections raised by the government to this lesser amount. Significantly, the PSR also does not identify a single individual who traveled to the Pybus Point lodge paying only $1,500. In every case, the individuals who hunted paid approximately $4,000 for the outfitting and guiding services offered by Veys. The market value of an outfitted wildlife hunt is not appropriately found under the law by subtracting from the outfitting service all other services and accommodations provided, except for the actually guided portion of the multi-day hunting expedition. While providing lodging, meals, and other inducements such as fishing, wildlife viewing, day hiking, etc. may have been offered, and may have been expenses that were incurred by Veys, their value is not appropriately subtracted to determine just the profit made for the actually hunting portion of the outfitted trip. *Atkinson*, 966 F.2d at 1273-74. In every illegal big game outfitting and

guiding case brought under the Lacey Act, there are some services that are provided as part of that service that are lawful, and some that are unlawful: it would create an absurd result, and fly in the face of controlling precedent, if a court were forced to determine the value of every service provided as a part of that hunt (like lodging, fuel for the vehicles, the cost of the meals, the time spent taking pictures or hiking, etc.), and subtract it from the cost of the outfitting service in order to arrive at the market value of the illegal hunt itself.

In this case, there is no difficulty ascertaining the market value of the outfitting and guiding services offered by Veys, and the Court should not and need not parcel out the value of each and every piece of the overall outfitted trip. Here, where the outfitting service advertised and offered was the opportunity to hunt black bear, for which Veys was paid approximately $4,000 per hunter, and, where other outfitters in the same market were offering similar outfitting and guiding services for approximately the same price, the preponderance of the evidence establishes that the fair market value for wildlife at issue in the offense should be calculated at $4,000 per outfitted hunter.[4]

---

[4] Even if the Court were to treat the first three hunters differently, and find that for these three hunters, who had originally booked fishing trips and then added-on the opportunity to hunt for two days during that trip for an additional $1,500, the total offense level would not change. If the Court considered the fair market value of these abbreviated last minute opportunities to hunt to have a fair market value of only $1,500 per hunt, the total for all the hunters would be $37,000, and still result in a 6 level increase pursuant to U.S.S.G. §2Q2.1(b)(3)(A), as discussed below.

**C. Using this $4,000 Fair Market Value, The Court Should Apply the Sentencing Guidelines and Sentence Veys at the Low End of the Applicable Guideline Range.**

Using this $4,000 figure, the total cost of the wildlife at issue in this case is $44,000, and results in a 6 level increase in offense level pursuant to U.S.S.G. §2Q2.1(b)(3)(A).[5] Accordingly, the defendant's final adjusted offense level should be 12. The Court should sentence the defendant consistent with the Guidelines in this matter. In Zone C, the Court has the option of satisfying the time of incarceration by having the defendant serve half the time incarcerated, and half the time in home or community confinement. Accordingly, the government seeks a sentence of five months incarceration, five months home detention, and three years probation. The sentence should also include fine and restitution amounts of $20,000, as the parties agreed in the plea agreement. This Guidelines sentence adequately (A) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; (B) affords adequate deterrence to the criminal conduct; and ( C) protects the public from further crimes. 18 U.S.C. § 3553(2). Furthermore, as a special term of the probation, the government seeks to have the Court prohibit Veys from engaging in offering or providing hunting outfitting and guiding services, and prohibit Veys from any and all hunting anywhere in the world.

[5] The table from §2B2.1 states that if the market value is greater than $30,000 but less then $70,000, the offense level is increased by 6.

## CONCLUSION

The PSR calculates the fair market value of the wildlife in a manner inconsistent with the clear guidance from the Ninth Circuit and inconsistent with other similar Lacey Act cases. The court should find that the fair market value of the wildlife at issue in the defendant's case is $44,000. The Court should therefore find a final offense level of 12 under the Sentencing Guidelines, and sentence the defendant to the minimum terms suggested by the Guidelines of five months incarceration followed by five months home detention, fine and restitution in the amount of $20,000, plus a three year term of probation including the special conditions discussed above.

RESPECTFULLY SUBMITTED this 25th day of July, 2007.

s/Robert S. Anderson
ROBERT S. ANDERSON
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
Phone:(406) 829-3322
Fax: (406) 542-1476
Email: robert.anderson8@usdoj.gov

s/ Wayne D. Hettenbach
WAYNE D. HETTENBACH,
Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
Phone: (202) 305-0213
Fax: (202) 514-8164
Email: wayne.hettenbach@usdoj.gov

s/ Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
#0108051

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2007, a copy of the foregoing SENTENCING MEMORANDUM was served electronically on: Brent R. Cole, Allen F. Clendaniel, and Kevin Fitzgerald.

s/ Steven E. Skrocki