Brent R. Cole
MARSTON & COLE, PC
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501
Telephone:   (907) 277-8001
Facsimile:   (907) 277-8002

Allen F. Clendaniel
DORSEY & WHITNEY LLP
1031 West Fourth Avenue, Suite 600
Anchorage, AK 99501-5907
Telephone:   (907) 276-4557
Facsimile:   (907) 276-4152

Attorneys for Defendant Alan J. Veys

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>vs.<br><br>ALAN J. VEYS and JAMES E. JAIRELL<br><br>                    Defendants. | Case No. 1:06-CR-00003-HRH-PMP<br><br>**DEFENDANT VEYS'**<br>**SENTENCING MEMORANDUM** |

## INTRODUCTION

Alan J. Veys ("Mr. Veys") has pled guilty to a **single class A misdemeanor count** of Conspiracy in violation of 18 U.S.C. 371 and 18 U.S.C. 2. This conviction subjects Mr. Veys to a **maximum** jail sentence of twelve (12) months. The Pre-Sentence Investigation Report ("Pre-Sentence Report") recommends that Mr. Veys essentially serve a sentence of eight (8) months. The Government will invariably argue that

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 1*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

Mr. Veys serve a sentence of at least ten (10) months based mainly on its calculation of the market value of Alaska black bears. Neither recommendation recognizes the significance of the Lacey Act lesser-included offense misdemeanor conviction or the obvious dichotomies between the roles of Mr. Veys and Mr. Jairell during the course of these events.

The essence of the crime which Mr. Veys pleaded guilty to is that Mr. Veys agreed to assist (conspired with) James Jairell in the sale of big game hunting services and did not ensure that a Registered Guide was involved in a series of hunts. This charge is significantly different that the charges in the original Indictment filed on July 18, 2006. In that Indictment, Mr. Veys was charged with one count of felony Conspiracy to Violate the Lacey Act, four felony counts of violating the Lacey Act, and one count seeking the forfeiture of a vessel used at Pybus Point Lodge worth approximately $85,000.00. The ultimate resolution of this case reflects the conflicting considerations that each party faced as this case approached trial. These considerations included: (1) the minimal role Mr. Veys played in these illegal activities; (2) Mr. Veys's concerted efforts to prove his lack of knowledge of the underlying illegal activity; (3) Mr. Veys's cognitive limitations; (4) Mr. Veys's cooperation with government officials from the beginning of this case; (5) the tremendous cost of defending against the original charges; (6) the significant penalties associated with a felony conviction; (7) the negative impact to Mr. Veys and his business which has already occurred as a result of the charges; and (8) the minimal impact on the resource (Alaska black bears).

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 2
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

Mr. Veys does not represent a danger to the community. He has already paid significant penalties for his limited involvement in James Jairell's hunting activities. His reputation, his fishing business, and his trust in his fellow humans have all been diminished by this investigation, these charges, and this plea. At the same time, he has actively assisted the government in proving the extent of Mr. and Mrs. Jairell's criminal culpability during this same period.

The parties' plea agreement envisions the Court being free to impose any sentence, using the Federal Sentencing Guidelines ("Sentencing Guidelines") only as discretionary guidelines, not mandatory guidelines ("This case arises out of conduct occurring after November 1, 1987 and as such is subject to calculation of an ***advisory sentence pursuant to the United States Sentencing Commission Guidelines.***"[1]). At his sentencing, Mr. Veys will seek a probationary sentence. He will ask that he be placed on probation for a period of one year and that he be required to pay a total of $22,400. This would be a fair and just sentence and will hopefully close this difficult chapter in Mr. Veys's life.

## I.    REQUEST FOR EVIDENTIARY HEARING

Pursuant to Local Criminal Rule 3.4(G), Mr. Veys requests an evidentiary hearing at sentencing. The Pre-Sentence Report contains several inaccuracies that could affect his sentence. Mr. Veys has previously noted extensive objections to the draft Pre-

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

---

[1]    P.4, Section D of the Pre-Sentence Report.

*Defendant Veys's Sentencing Memorandum - 3*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

Sentence Report,[2] but these objections have not resulted in substantial changes in the Pre-Sentence Report. This Pre-Sentence Report will accompany him throughout his period of incarceration and his probation period and it is imperative that it contains accurate information. Importantly, Mr. Veys objects to the number of black bears the Report erroneously attributes to him.

## II.    MR. VEYS'S HISTORY

### A.    Background

Mr. Veys was born on September 18, 1953, and raised in Washington. He is the oldest boy of two children born to Andre M. Veys and Emma E. Coupe. He has one younger brother who still lives in Longview, Washington. Mr. Veys attended elementary, junior high, and high school in the area of Kelso, Washington. He graduated from Kelso High School in 1974. Copies of Mr. Veys's high school transcripts are attached as Exhibit B. These records support the contention that Mr. Veys has cognitive learning disabilities.

In addition to graduating from high school, Mr. Veys has obtained general contractor licenses and his pilot certificate with the following ratings: private pilot, land and seaplane, commercial pilot, land and seaplane, and rotorcraft and certified flight instructor. Although, for several of these licenses, Mr. Veys required several attempts to pass the written portion of the exams due to extreme reading difficulties.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

---

[2]    See Exhibit A.

### B.     Employment

After graduating from high school, Mr. Veys worked at clerking positions until he began to build houses and multi-resident buildings. Since that time, Mr. Veys has remained essentially self-employed in the building trade industry or the fishing industry. Mr. Veys started a contracting business around 1973-74. The contracting business built houses in the Longview/Castle Rock area in Washington State. Mr. Veys essentially designed and built these homes by himself. Mr. Veys engaged in this activity until he left Washington and traveled north to Alaska. Prior to coming to Alaska, Mr. Veys got his rotor wing certificate and flew helicopters for Long Air, a helicopter company out of Longview, Washington. This involved contract helicopter work for the Corp of Engineers and the U.S. Forest Service, the U.S. Weather Service, the U.S. Geological Service, and the Drug Enforcement Administration (night surveillance with agents).

Mr. Veys came to Alaska in approximately 1984. He started building his lodge at Pybus Point in 1985. Mr. Veys has basically built, with his own two hands, the lodge, its surrounding guest and employee buildings, and his home. He purchased or salvaged the materials, arranged for them to be shipped by barge to Alaska, and then built these buildings with help from friends. Mr. Veys is proficient in woodworking, welding, plumbing and electrical matters. He operates his own heavy equipment. He repairs his equipment, boats and motors, and he maintains all the sewer lines, electrical equipment, and mechanical equipment necessary to maintain the running of the lodge.

Since the opening of the lodge in 1986, Mr. Veys has remained employed as an owner of a fishing lodge business that caters to hundreds of people each summer. For the

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

past twenty years, Mr. Veys has operated his lodge for clients from around the world interested in Alaskan fishing and outdoor activities.

### C.    Letters of Support From Family and Friends

Attached to this Sentencing Memorandum are letters from friends and family in support of Mr. Veys. *See* Exhibit C. In almost all respects, the letters speak for themselves and the support for Mr. Veys is self-evident. These letters show sincerity and respect for an individual who has sought hard to be a good friend and companion and provide quality fishing and sightseeing experiences to people around the world. The comments of these people demonstrate that Mr. Veys has been a significant and positive spokesperson for the State of Alaska throughout the time he has been in the lodge business. They also show that he has devoted his life to developing honest and ethical fishing activities in Pybus Bay.

### D.    Mr. Veys's Financial Situation

In 2004, Mr. Veys attempted to sell the lodge. These efforts resulted in a civil case being brought against him by potential purchasers in Wyoming. The case went to trial with the jury finding Mr. Veys liable for breach of a purchase agreement for past and future damages exceeding $3 million dollars. The Judgment was recently upheld on appeal by the Wyoming Supreme Court. Mr. Veys is collaterally challenging the validity of the judgment, but the size of the judgment ultimately forced Mr. Veys, Lone Eagle Resorts, Inc. (runs Pybus Point Lodge) and Alan J. Veys Properties LLC (owns the lodge) to file for bankruptcy in 2006.

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 6*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

Mr. Veys is presently operating his lodge under federal bankruptcy protection. All of his assets and those of his companies are under the control of the federal bankruptcy court. The Pre-Sentence Report used the publicly available bankruptcy reporting from 2006, when more recent reporting is available. This information has been provided to the Pre-Sentence Report writer for inclusion with the Report.

For now, Mr. Veys has lost control of his funds and assets except for expenditures in the normal course or those approved by the bankruptcy court. He has filed a reorganization plan, which is pending approval before the bankruptcy court. The plan provides for payment in full with interest to all creditors over a period of approximately five years. The amount owing to the plaintiffs in the Wyoming litigation will be secured with a lien on real property belonging to Mr. Veys and his companies' real property pursuant to voluntary deeds of trust. An initial payment may be made to the Wyoming plaintiffs once the bankruptcy court confirms the plan. Additional payments would be paid in quarterly installments based on a 15-year amortization with a balloon payment due at the end of five years. Small, unsecured creditors with claims equal to or less than $1,000 will be paid in full 60 days following confirmation of the plan. Other general unsecured creditors will be paid in full in equal quarterly payments over four years. Priority tax claims, administrative expense claims, bankruptcy fees, and the fees and expenses of professionals will be paid in full upon confirmation and approval of the bankruptcy court.

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

### III.     THE IMPACT OF CRIMINAL CHARGES ON ALAN VEYS

#### A.     Mr. Veys Has Been On Bail Conditions For Ten Months Without Incident.

Mr. Veys was arraigned on September 21, 2006.  Although his bail conditions at the time were minimal, he has thoroughly complied with the terms of his bail conditions for the past nine months.  In fashioning an appropriate sentence, the Court should take into consideration Mr. Veys's complete compliance during this extended period.

#### B.     These Charges Have Affected Mr. Veys's Ability to Operate His Fishing Lodge.

Mr. Veys's fishing operation has been adversely affected by this criminal investigation.  Mr. Veys's fishing business depends on its customers:  people willing to travel to Alaska to spend $3,295 to $3,795 for 5-7 days of fishing in Southeast Alaska.  Conventions and sportsman shows are the primary means for signing up new lodge clients for the upcoming year.  Mr. Veys has been the primary promoter of his lodge, attending 8-12 sportsman shows in the off-season each year.  These shows normally occur from November through March and last 3-4 days.  This year, Mr. Veys was significantly hindered by the fact that he was not able to attend several of the most important shows because he had to remain in Alaska and prepare for trial.  During the 2006-07 sportsmen show season, Mr. Veys was questioned extensively about the serious nature of the charges against him by prospective clients.  A number of corporate clients cancelled their bookings as a result of the charges and/or Mr. Veys's plea.

When times were good, Mr. Veys entertained approximately 310 paying clients per summer fishing season at his lodge.  His sign up rate for this year, while not as bad as

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 8*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

originally projected, has not even approached his 2005 season numbers. Mr. Veys hopes to have 260-290 clients through the lodge this summer. Many of these 2007 guests were signed up prior to his plea, and considerable concern exists for next year sales, especially if Mr. Veys becomes unavailable due to sentencing to attend the shows after this season.

The damage to Mr. Veys's business reputation as a result of the original charges is expected to linger through the 2008 season. This is particularly dependent on the sentence imposed by this court. While the parties have agreed that Mr. Veys will not have to serve any jail sentence until the end of the 2007 fishing season, any jail sentence or home confinement requirement will significantly affect Mr. Veys's ability to market his business. While Mr. Veys and his advisors are presently planning for this contingency, this only underscores the significant impact that this case will have on Mr. Veys's future, and distinguishes him from other defendants. In addition, other people will be affected by the sentence Mr. Veys receives. These include the eleven workers that depend on the lodge for income and his creditors who expect him to operate the lodge in the debt Plan of Reorganization presently in confirmation in the U.S. Bankruptcy Court.

## IV.   MR. VEYS'S COMMITMENT TO ASSISTING THE GOVERNMENT IN ITS INVESTIGATION

### A.   Mr. Veys's Voluntary Participation In The Government's Investigation Prior To Being Charged.

Mr. Veys's lodge at Pybus Point was originally served with a search warrant on May 25, 2004. Mr. Veys fully cooperated with law enforcement officers serving the search warrant. Additionally, Mr. Veys agreed to be interviewed for nearly five hours

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

without the assistance of counsel.  During that interview, Mr. Veys repeatedly denied awareness of Mr. Jairell's illegal activities.  He was confronted with the signed affidavits submitted on behalf of Mr. Jairell's Class A Assistant Guide License, but he repeatedly denied placing any information relating to Mr. Jairell's hunting experience on the affidavits that he signed.  He told the officers that the numbers did not look like his and that "Jimmy" must have written them in.  He said he only signed one affidavit for Mr. Jairell—not two.  The officers admitted that they had not looked at the affidavits carefully.  *See* Exhibit D, Interview of Alan Veys, at p. 160.  Later, extensive forensic evaluation of the affidavits that served as the foundation of the government's case proved Mr. Veys to be correct; this forensic examination was done by a handwriting expert paid for by Mr. Veys.

In November 2005, Mr. Veys received a letter from the U.S. Attorney's Office indicating that he was the subject of this investigation.  He hired counsel and agreed to maintain a dialogue with the Government to reach a resolution to this investigation.  It has always been clear to all parties involved that Mr. Jairell was the major target of this investigation.  Mr. Veys agreed to cooperate in this investigation and gave a statement to law enforcement officials on March 7, 2006.  In April 2006, Mr. Veys signed a tolling agreement with the Government regarding the running of the applicable statute of limitations.  He maintained communications with the government, but after settlement talks were unable to resolve the matter, and with the Government facing deadlines set by the tolling agreement, the Government indicted Mr. Veys on July 19, 2006.  Mr. Veys voluntarily appeared for his arraignment on September 27, 2006.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 10*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

### B.     Mr. Veys's Pre-Trial Disclosure of His Investigation.

After Mr. Veys was arraigned, Mr. Veys and his advisors began looking at the evidence against him; primarily the documents, which Mr. Veys was alleged to have signed in April 2000.  These documents were key to the Government's case against Mr. Veys and prominently portrayed in the Indictment.  *See* Indictment p. 8-9, ¶ 2-5.  In the course of reviewing copies of the documents, it became apparent that some of the documents had been doctored.  In an affidavit purportedly executed on April 20, 2000, Mr. Veys's name is scratched out and Mr. Jairell's name (in Mr. Jairell's handwriting) is inserted.  The facts stated in the affidavit written by Mr. Veys were true only for him.

Mr. Veys's investigators and advisors then traveled to the Division of Occupational Licensing, Big Game Commercial Services Board, to actually view in person the originals of the documents which formed the basis of the charges against Mr. Veys.  The discrepancies in the documents were readily apparent due to the color of the inks used and the different individual handwriting found on the documents.  *See* Exhibit E, Color Copies of the Original Affidavits.  Despite their zeal to prosecute Mr. Veys, state and federal law enforcement officers did not take the time to actually view the originals until after the discrepancies with the documents were brought to their attention on or about November 14, 2006.  In an effort to reach a settlement, Mr. Veys directed that this information be disclosed to the prosecution, instead of waiting to raise the discrepancies at trial to try to catch the government unaware.  Again, these facts simply demonstrate that Mr. Veys, throughout the course of this investigation and this charging period, has cooperated with this investigation and sought to share the

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

information that he and his advisors have uncovered in an effort to demonstrate his limited role in Mr. Jairell's game violations.

### C. Mr. Veys Disclosure of the Forensic Document's Examiner Report.

After bringing these documentary forgeries to light, Mr. Veys was again confronted with other documents that the Government contended corroborated their case against him. After notifying the Government of suspicions regarding Mr. Jairell's Coast Guard license, Mr. Veys was confronted with allegations that he authored letters in support of Mr. Jairell and that he signed a Statement of Verification containing false information on behalf of Mr. Jairell's Coast Guard License Application. *See* Exhibit F.

In order to vindicate himself with regard to the guide licensing documents and to challenge the contentions of the government with regard to the maritime licensing issues, Mr. Veys enlisted the services of Mr. David Moore, a private forensic documents examiner with impeccable credentials. Mr. Moore is based out of Sacramento, California. After receiving all of the original material requested in preliminary motions and preparing a report, Mr. Moore returned the documents to the Government and disclosed his report to the Government. While the Pre-Sentence Report indicates otherwise, counsel for Mr. Veys is not aware of any government experts reviewing the documents or preparing any reports. As far as is known at this point, Mr. Moore's report has not been refuted in any way.

Mr. Moore's report is important for a number of reasons.

- It corroborated Mr. Veys statement that he only remembered signing one affidavit for Mr. Jairell—the other one he signed for himself and Mr. Jairell scratched his name out and inserted his own.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 12*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

- It corroborated Mr. Veys's statement that no dates were written in the April 21, 2000 affidavit when he signed it and that these had to be filled out by Mr. Jairell.

- It corroborated Mr. Veys's contention that Mr. Jairell doctored all of these affidavits for his benefit without the signatories' knowledge.

- It demonstrated that someone (presumably Mrs. Jairell) forged Mr. Jairell's signature on his Coast Guard license application.

Mr. Moore's forensic findings demonstrate that Mr. and Mrs. Jairell manipulated Mr. Veys, and used his identity to fraudulently obtain Mr. Jairell's guide and maritime credentials. Mr. Moore's report established that Mr. Veys was not a willing participant in Mr. Jairell's scheme, and instead was an unwilling and unknown victim of Mr. Jairell. After this information was disclosed to the Government, Mr. Jairell promptly reached an agreement to plead to two felony counts. Mrs. Jairell has not been charged with any crimes. It has been disclosed that as a part of the deal with Mr. Jairell, Mrs. Jairell will not be charged with any federal crimes.

Finally, Mr. Veys was offered the opportunity to plead to one misdemeanor. As part of his plea agreement, he has agreed to continue to cooperate with the Government.

## V.    THE PLEA AGREEMENT

The plea agreement has been filed with the Court but it is important to note the highlights since certain provisions were not noted in the Pre-Sentence Report.

- Mr. Veys will agree to pay a special assessment of $25.00 at the time of sentencing.

- Mr. Veys agrees to cooperate with any federal, state, or local investigations and prosecutions requested of him and to provide truthful and complete information.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

- Mr. Veys will agree to pay a combined fine/restitution amount of at least $20,000.

- Mr. Veys agreed to turn in his Subsistence Halibut Registration prior to sentencing and agreed not to avail himself of subsistence halibut fishing privileges pending a decision of his appeal or changes in the NOAA regulations. Mr. Veys has already turned in this certificate.

- Mr. Veys agreed to turn in his transporter license and not act as a transporter, assistant guide or guide during the period of his probation.

- Mr. Veys has agreed that during his probation or supervised release, no hunting shall be conducted by persons who are clients of Pybus Point Lodge or stay overnight at the lodge for as long as Mr. Veys owns the lodge.

- Mr. Veys has agreed that during his probation or supervised release, he will not engage in hunting anywhere or accompany anyone hunting.

- Mr. Veys will be allowed to possess a firearm during his probation or supervised release.

- If the Court imposes a period of jail time or home confinement, it has been agreed that Mr. Veys will not have to serve this time until after the conclusion of his fishing season in late September/early October, when he has had time to winterize his lodge and/or home.

## VI.    APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

After *United States v. Booker*, 543 U.S. 220 (2005)*,* the Sentencing Guidelines are advisory. Mechanical application of the Guidelines by the Sentencing Court is no longer mandatory. Instead, the Court's sole obligation is to arrive at a fair and just sentence consistent with the statutory factors outlined set forth in 18 U.S.C. § 3553(a). As long as a sentence is reasonable, the Court is free to fashion a sentence completely independent of the Guidelines. Indeed, in *Rita v. United States*, the Supreme Court recently noted that a sentencing Court is prohibited from giving a presumption of reasonableness to a

DORSEY &
WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

Sentencing Guidelines sentence. 127 S. Ct. 2456, 2465 (U.S. 2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Because the Guidelines no longer bind this Court and a sentence mandated under the Guidelines is no longer entitled to a presumption of reasonableness, this Court should first turn to the statutory factors enunciated in 18 U.S.C. § 3553(a). *See e.g., United States v. Mohamed*, 459 F.3d 979, 986-987 (9th Cir. 2006) (holding that a sentence outside of the Guidelines range whether pursuant to § 5K2.0 or section 3553 is only overturned if the ultimate sentence is unreasonable). Because a reasonable and sufficient sentence is the ultimate goal, the Court should first determine an appropriate sentence for Veys under the factors laid out in 18 U.S.C. § 3553(a) and then proceed to compare that sentence to the sentence under the Guidelines. This case especially warrants such an approach because, under the Guidelines, a *negligent* misdemeanor conviction is scored exactly the same as an *intentional or knowing* felony conviction. Under the Guidelines, a person who is convicted of the lesser included *negligent* Lacey Act misdemeanor offense inexplicably receives the same exact sentence as a person (up to a year) who is convicted of an *intentional or knowing* Lacey Act felony crime holding every other sentencing guideline factor constant. Clearly, the Guidelines fail to take into account, that someone who is convicted of a *negligent* misdemeanor Lacey Act count is much less culpable than someone who is convicted of an *intentional* or *knowing* Lacey Act felony.

Given this potentially unjust result, it is critical that the court *first* review the section 18 U.S.C. § 3553 factors and determine a reasonable and just sentence for

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Mr. Veys. While it is Mr. Veys's position that the sentence under 18 U.S.C. § 3553(a) or the Guidelines would be the same – a probationary sentence – if mechanical application of the Guidelines mandates a prison sentence, then the sentence determined by the Guidelines must be disregarded as conflicting with the appropriate sentence under 18 U.S.C. § 3353(a). Therefore, this Court should first consider an appropriate sentence under 18 U.S.C. § 3353(a).

Applying the factors cited in 18 U.S.C. § 3553(a) to the facts of this case reveals that a probationary sentence is the only appropriate sentence for Mr. Veys. These factors include the following: (1) the nature and circumstance of the offense and history and characteristics of Mr. Veys; (2) the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public from further crimes and provide Mr. Veys with training and treatment; (3) the kinds of sentences available; (4) the established Guidelines sentencing ranges; (5) any pertinent Guidelines policy statements; (6) the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes; and (7) the need to provide restitution to victims of the offense. 18 U.S.C. § 3553(a)(1-7).

(1)    Nature and Circumstances of Offense and the History and Characteristics of the Defendant.

a)    Nature and Circumstances of the Offense.

Mr. Veys has successfully owned and operated a fishing lodge on an inholding on Admiralty Island at Pybus Point from 1984 to the present. During that 23-year period, Mr. Veys and his employees have had one minor fishing related conviction. In the mid to

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

late 1990's, Mr. Veys met Mr. Jim Jairell on a hunting trip.  Mr. Jairell expressed an interest in hunting and guiding in Alaska and Mr. Veys invited Mr. Jairell to come to Pybus Point to visit and hunt.  After Jairell's visit to Alaska, Mr. Veys befriended Mr. Jairell in part because of their mutual interest in hunting and in part because Mr. Jairell had electrical contracting skills.  As a consequence, Mr. Jairell ended up assisting Mr. Veys in the construction and expansion of his lodge facilities.  Because of this, Mr. Veys naively agreed to assist Mr. Jairell in his stated desire to become a hunting guide in Alaska.  Prior to that, Mr. Veys had no involvement in the hunting guide industry, nor had Mr. Veys considered becoming involved in the hunting guide industry.

Mr. Jairell lawfully received his non-resident assistant guide license in 1999 and proceeded to work with a registered guide during the fall season.  He then approached Mr. Veys about running guided bear hunting ventures out of the Pybus Point Lodge. Since Mr. Veys was willing to help Mr. Jairell, a man Mr. Veys believed to be his friend, with his dreams and goals, Mr. Veys agreed.  In 2000, Mr. Veys approached Mr. Larry Hooten, a registered guide in Alaska, about assisting in this venture.  Mr. Hooten agreed. In April 2000, Mr. Jairell convinced Mr. Veys that he should get a transporter license issued by the State of Alaska.  At the same time, Mr. Jairell filed an application to become a Class A assistant guide in Alaska.  The difference between an assistant guide and a Class A assistant guide is that the Class A assistant guide can be in the field with the client without the registered guide, while the assistant guide cannot be with the client without the registered guide.  A Class A guide license has much more stringent requirements which Jim Jairell could not legally meet.  In filling out the transporter

DORSEY &
WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

license, Mr. Jairell told Mr. Veys that he had to fill out an affidavit of residency and hunting which Mr. Veys did and gave to Mr. Jairell.   Unbeknownst to Mr. Veys, Mr. Jairell then scratched Mr. Veys's name out and put his own name in the affidavit. That evening, Mr. Jairell got together with Mr. Larry Hooten, Ms. Val Svenson, Mr. Wes Baumann, and Mr. Veys and convinced them to sign his affidavits of residency and hunting experience.  He asked Mr. Veys to sign another affidavit of residency for him. Mr. Veys signed this affidavit.   When questioned by federal authorities about the affidavit, Mr. Veys stated that the actual dates were not listed in the affidavit when he signed the affidavit.  Ms. Svenson has confirmed that the dates were not on the affidavit when she signed it.  Mr. Moore, Mr. Veys's handwriting expert has confirmed that the false hunting experience dates were written in by Mr. Jairell, not Mr. Veys or Ms. Svenson.  Mr. Hooten, who signed the affidavit attesting to the residency and hunting experience of Mr. Jairell also supplied a letter of recommendation for Mr. Jairell. Mr. Hooten has never been charged with any crimes arising out of these events.  These documents, although false, were filed by Mr. Jairell with the Division of Occupational Licensing and formed the basis for Mr. Jairell unlawfully obtaining his Class A assistant guide license, and in the process unfortunately implicated Mr. Veys.

Thereafter, Mr. Veys believed that Mr. Hooten would be the registered guide on all bear hunts that Mr. Jairell was involved with in 2000.  A memorandum prepared by Mrs. Jairell confirmed Hooten's involvement.  See Exhibit G.  Spring and fall bear and goat hunts were conducted in 2000 under the guidance of Mr. Hooten.  In the spring of 2000, Mr. Veys entertained Mr. Thomas Plank, Mr. Moreland, and Mr. Ralph Kalies as

DORSEY &
WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 18
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

fishing clients at his lodge. The fishing turned out to be poor and the three people inquired about other activities. Mr. Veys suggested black bear hunts instead of fishing and introduced them to Mr. Jairell. Unbeknownst to Mr. Veys, Mr. Jairell had each of these hunters sign contracts indicating that he was guiding them for black bear hunts for $1,500.00. See Exhibit H. Two of these bear hunters shot bears, one hunter was unsuccessful. Mr. Jairell was the only person in the field with these individuals. He was not lawfully entitled to guide these bear hunts for pay because he was only a class A assistant guide. If he had not received compensation, however, he would have been entitled to accompany these hunters into the field.

After 2000, Mr. Hooten had a falling out with Mr. Jairell. Mr. Veys contacted Mr. Helmrick, a retired U.S. Forest Service employee, who lawfully became a registered guide. A similar arrangement was entered into between the three parties where Mr. Helmrick would act as the registered guide and Mr. Jairell would act as the assistant guide and Mr. Veys would provide his boats, lodge facilities, and fishing service during the week for the clients. The parties booked guided brown bear hunts, black bear hunts, and goat hunts for 2001. The parties again received a memorandum from Mrs. Jairell reinforcing this understanding and allocating revenue to the various parties for their respective services. See Exhibit I. In the spring of 2001, Mr. Helmrick's traveled to Pybus Point and conducted spring brown bear hunts with Mr. Jairell. During this time, Mr. Helmrick's sailboat was moored in Pybus Bay. Just prior to Melvin S. Mullikin, Alfred Rordane III, Ken Minchew, and Trey Minchew arriving in Pybus Bay for their fishing and hunting trip, Mr. Helmrick's sailboat left Pybus Point. Mr. Jairell then took

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum -* 19
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

four individuals black bear hunting.  Mr. Veys assumed these hunts were being lawfully

conducted through Mr. Helmrick just like the earlier brown bear hunts.  Mr. Veys saw

Mr. Helmrick return to Pybus Point shortly after the clients had taken their bears and left

and assumed that Mr. Jairell had coordinated these hunts with Mr. Helmrick.  Mr. Veys

never filled out any of the paperwork associated with sealing these bear hides.

Unbeknownst to Mr. Veys, Mr. Jairell filed false sealing documents indicating that these

were unguided hunts after Mr. Helmrick refused to acknowledge that he was involved in

these guided hunts.  Mr. Veys was not privy to this conversation between Mr. Helmrick

and Mr. Jairell.

In the fall of 2001, three Salt Lake Hunters, John Corak, Wendel Prows and Bart

Fallmer, and Virginia Papick were scheduled to come to the lodge and fish and hunt

black bears.  Mr. Jairell was not present at the lodge when they arrived and Mr. Veys had

to find Mr. Jairell and bring him back to the lodge.  Mr. Jairell proceeded to guide these

four hunters even though he knew that Mr. Helmrick was guiding goat hunters at the

time.  Although Mr. Helmrick died in October 2005, he was never charged with any

crimes arising out of these events.  Mr. Veys was lawfully permitted to work with

Mr. Helmrick as the registered guide supervising Mr. Jairell.

In 2004, the federal government operated an undercover brown bear hunt with

Mr. Jairell and his assistant guides.  These undercover hunters stayed at Mr. Veys lodge.

These hunters went out fishing almost every day with their fishing guides.  They reported

no fishing violations during the time.  Many of the bear hunters were questioned about

the fishing activities and all indicated that they were informed of fishing regulations

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 20
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

upfront and no violations were observed.  Mr. Veys was never in the field with any of these hunters.  Mr. Veys never assisted any of the hunters in skinning or caping any of the hides.  Mr. Veys was not involved in the sealing of these bear hides and did not fill out the paperwork to seal the hides.

As noted above, Mr. Veys plead guilty to one misdemeanor count alleging that he negligently entered into a conspiracy to violate the Lacey Act by assisting in the transportation of black bears in interstate commerce that in the exercise of due care <u>he should have known</u> were taken on illegally guided hunts because Mr. Jairell was not a properly licensed guide in Alaska.

While the government's case against Mr. Veys initially appeared to be overwhelming, it was almost exclusively based upon the premises that Mr. Veys knowingly prepared the two affidavits (one on April 20 and one on April 21) used to support Mr. Jairell's application for his Class As assistant guide license.  However, the government investigators failed to take the time to look at the original affidavits located right in Juneau.  They only did this after it was pointed out that these documents were obviously altered and created by Mr. Jairell for Mr. Jairell's own illegal benefit.  With this new insight along with a better understanding of how Mr. Veys' personality causes him to be overly trusting of other people, especially those who become his friend, it became clear that the Indictment's allegations of Mr. Veys's role as an intentional accomplice or a knowing conspirator in these alleged crimes was not accurate.

Later, Mr. Veys demonstrated that during this alleged conspiracy, Mrs. Jairell most likely forged Mr. Veys' signature (an unlikely requirement for her if Mr. Veys was

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

knowingly engaged in a criminal conspiracy with her husband) on U.S. Coast Guard Documents and knowingly prepared false documents on her husband's behalf. Under the weight of the evidence and in light of the assistance and information that Mr. Veys provided to the government which ultimately led to Mr. Jairell entering a guilty plea to two felony charges, the government agreed to reduce the five felony charges to one misdemeanor charge which is before the court today.

It is clear that Mr. Veys's conduct was minimal and is not worthy of significant punishment or blame. A probationary sentence is reasonable with a short period of home confinement in the range of two (2) months being the maximum sentence justified by the nature of the offense. Given the fact that Mr. Veys has successfully been out on bail for a period of almost one year, a period of probation longer than 18 months is unnecessary.

b)      History and Characteristics of Mr. Veys.

The Pre-sentence Report accurately portrays the personal history and characteristics of Mr. Veys. The letters which have been provided to the court in support of Mr. Veys provide valuable insight in to Mr. Veys' character. Additionally, Dr. Sperbeck prepared a psychological evaluation on behalf of Mr. Veys for trial. Mr. Veys intends to present Dr. Sperbeck as a witness at sentencing to give the Court greater insight into Mr. Veys personality deficiencies and challenges which have both led to his successes and his downfalls. In light of Mr. Veys lack of criminal history and his noted personality deficiencies, a probationary sentence is reasonable and just. A sentence of probation with period of home confinement in the range of two (2) months along with the conditions agreed to by the parties is the harshest sentence that would be reasonable

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 22*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

and sufficient in light of Mr. Veys's character and background. Given the fact that Mr. Veys has successfully been out on bail for a period of almost one year, a period of probation longer than 18 months is unnecessary.

>    (2)    Need for the Sentence to Reflect the Seriousness of Offense, Afford Deterrence, Protect the Public, and Rehabilitate the Defendant.

For purposes of analysis under these factors, it is assumed that the Court and the government are in agreement that the mens rea of a crime often dictates the seriousness of an offense and the need for increasingly severe punishments. For example, take the typical homicide or death by a person driving a car. If a person intentionally causes the death of another by driving over them, society condemns that action by charging a perpetrator with Murder in the First Degree and imposing sentences up to life in imprisonment and even death. On the other hand, if a person negligently caused the death of another person in an automobile accident, the law does turn an accident into a criminal offense. The determination of criminal activity is thus based in part on the mens rea required for the offense. *See* H.L.A. Hart, Negligence, Mens Rea and Criminal Responsibility, reprinted in PUNISHMENT AND RESPONSIBILITY: ESSAYS IN THE PHILOSOPHY OF LAW 136, 136 (1968) ("To break [a] Ming china, deliberately or intentionally, is worse than to knock it over while waltzing wildly round the room and not thinking of what might get knocked over. Hence, showing that the damage was not intentional, but the upshot of thoughtlessness or carelessness, has its relevance as a mitigating factor affecting the quantum of blame or punishment.").

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 23
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

This simple concept is equally applicable to this case. Mr. Veys has pled guilty to negligently conspiring to violate the Lacey Act, not knowingly or intentionally acting in this fashion. Mr. Jairell, on the other hand, is charged with knowingly violating the Lacey Act. Under these circumstances, a probationary sentence and the conditions agreed to by the parties would be more than sufficiently reflect the seriousness of Mr. Veys's negligent conduct. A short period of home confinement in the range of two (2) months is the maximum justifiably sentence given Mr. Veys's limited involvement and culpability. Given the fact that Mr. Veys has successfully been out on bail for a period of almost one year, a period of probation longer than 18 months is unnecessary.

(3)    Kinds of Sentences Available.

Under the plea agreement, the Court is free to impose a sentence it feels is fair and just under the circumstances. This can include home confinement, a half way house, or a jail sentence. This can include a fine and community work service.

(4)    Established Guidelines Sentencing Ranges.

Given that the Sentencing Guidelines are no longer mandatory, this factor has little to no bearing on the reasonableness of the sentence under § 3553(a).

(5)    Pertinent Policy Statements.

Mr. Veys is unaware of any pertinent policy statements other than those noted below.

(6)    Need to Avoid Sentence Disparity.

The need to avoid sentencing disparity necessarily implies the need to avoid imposing similar sentences for people who are not similarly situated. In Mr. Jairell's

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 24
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

case, a significant period of incarceration is warranted given that Mr. Jairell has been convicted of multiple State fish and game criminal offenses, that he has pled guilty to multiple felony Lacey Act violations, and that he has acknowledged that he "knew" what he was doing was wrong and proceeded forward anyway.   In this case, however, Mr. Veys should not receive a similar type of sentencing.  He does not have the same criminal history.  He pled guilty to only one crime a – misdemeanor.  He was merely "negligent."  He did not acting knowingly or intentionally when he committed this crime. He was not even reckless.  Under these circumstances, a probationary sentence is more than sufficient to satisfy the distinction between the roles of the individual defendants. The maximum justifiable sentence given the vast disparity in culpability between Jairell and Veys would be short period of home confinement in the range of two (2) months. Given the fact that Mr. Veys has successfully been out on bail for a period of almost one year, a period of probation longer than 18 months is unnecessary.

(7)    Need to Provide Restitution to Victims of the Offense.

The proper application of this factor results in a probationary sentence.   The "victim" of this crime is the State of Alaska because illegal guiding occurred in violation of Alaska's professional occupation statutes.  Mr. Veys is prepared to make restitution in the amount of $600 for each black bear that is properly attributed him.  AS 16.05.925(b) sets the restitution value of an Alaska black bear at $600.  Given that the victim, the state of Alaska, will be made whole by Mr. Veys as party of a probationary sentence, this factor strongly supports a probationary sentence.

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

## VII.    DISCUSSION OF SENTENCING GUIDELINES

This part of Mr. Veys's sentencing memorandum follows the steps given by the Application Instructions of the United States Sentencing Commission, <u>Guidelines Manual</u>, Section 1B.1 (Nov. 1994), for implementation of the Guidelines.  As noted before, under the terms of the parties' plea agreement and current case law, the Sentencing Guidelines are discretionary and not mandatory.  This Court is not bound by the Guidelines and has an independent obligation under 18 U.S.C. § 3553 to enter a fair and just sentence.  Proper application of the Guidelines, however, results in a calculation that permits a probationary sentence, just as application of the § 3553 factors results in the conclusion that a probationary sentence is a just and reasonable sentence in this case.

### A.    Base Offense Level:

Mr. Veys was convicted of one count of misdemeanor conspiracy to violate the Lacey Act.  The U.S. Sentencing Commission guideline for violation of these offenses is 6.  Mr. Veys agrees with the Report in this determination.

### B.    Specific Offense Characteristic:

Mr. Veys agrees with the Report that a two level increase is appropriate given that the offenses involved a pecuniary gain to the defendant.

### C.    Specific Offense Characteristic:

The Report suggests a four level increase is appropriate based upon the Fraud table under U.S.S.G. § 2B1.1.  Mr. Veys vigorously disagrees with this assessment.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

### 1.    Fraud table cannot be applied to a negligent criminal conduct.

First the § 2B1.1 table ("Fraud table") should not be applied to Mr. Veys. Mr. Veys has been convicted of **negligently** conspiring to violate the Lacey Act, which does not have as an element the intent necessary for fraud. A felony Lacey Act violation is a specific intent crime. Mr. Veys's misdemeanor violation, however, is based on the fact that Mr. Veys conspired to transport bear parts that in the exercise of due care he should have known were taken on illegally guided hunts. The crimes noted in the Fraud table in § 2B1.1 are all specific intent crimes, e.g. larceny, embezzlement, theft offenses involving stolen property; property damage, fraud, deceit, forgery, and counterfeiting. These crimes are all intentional crimes.

Research reveals no case where a fraud-table enhancement was given for a conviction based on criminal negligence. The Application Notes to § 2B1.1 obviously envision the Fraud table applying to intentional and knowing conduct. Note 3 specifically defines loss for the purposes of § 2B1.1 as including "intended loss," demonstrating that the Fraud table is reserved for intentional criminal offenses. *See* U.S.S.G. § 2B1.1, *cmt.* 3. While the Fraud table is appropriate for measuring the value of wildlife illegally taken or sold for a Lacey Act felony – an intentional offense – it is not appropriate for a Lacey Act negligent lesser-included misdemeanor offense. Application of the fraud table to this case would result in an enhancement of Mr. Veys's sentence for mere negligent conduct, not intentional or knowing criminal activity. The fraud table was never intended to cover negligent conduct and should not apply to Mr. Veys's sentence. Accordingly, only a one-level increase is justified under § 2Q2.1(b)(3)(A).

DORSEY &
WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 27*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

## 2.     The market value of each bear is $600.

The appropriate market value for the each of the black bears taken during the hunts in question ("wildlife") is $600.  This is the restitution value placed on an Alaska black bear by Alaska statute.  *See* AS 16.05.925(b).  The actual market value of the black bears is impossible to ascertain.[3]  There is no ascertainable marketplace for a black bear killed in Alaska and therefore, no ascertainable market value.  Fortunately, the Application Notes to § 2Q2.1 explain what to do when market value is difficult to ascertain.  Application Note 4 provides:

> When information is reasonably available, "market value" under subsection (b)(3)(A) shall be based on the fair-market retail price.  Where the fair market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (e.g., taxidermy) cost.
> U.S.S.G. § 2Q2.1(b)(3)(A), cmt. 4 (emphasis added).

Application Note 4 specifically notes that restitution cost is a good indicator of fair market value when fair market value is difficult to ascertain.  Alaska has statutorily set the restitution amount for an illegally killed black bear at $600.00.  *See* AS 16.05.925(b)(1).  This statute has been on the books since 1996.  *See* am § 1 ch 113 SLA 1996.  Because there is no "fair market retail price" for Alaska black bears, the restitution amount determined by the Alaska legislature provides the most reliable information for the Court to make a reasonable estimate of the market value of the bears.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

---

[3]     U.S.S.G. § 2Q2.1 specifically requires a determination of the market value of the *wildlife*, not the market value of the *opportunity* to take the wildlife.

*Defendant Veys's Sentencing Memorandum* - 28
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

Accordingly, the Court should determine for the purposes of sentencing that each Alaska black bear had a value of $600.

The "acquisition and preservation cost" that will likely be argued by the Government does not provide a reasonable estimate of the "market value" of the black bears at issue. A cost of a guided hunt does not approximate the "market value" of a black bear. The cost of a hunt represents what a hunter is willing to pay for the opportunity to take a bear in a specific area with a specific guide. The hunter is paying for the hunting experience, not the wildlife. The restitution cost that the State of Alaska places on a bear that is illegally taken is a much better estimate of the retail market price of the actual wildlife. It is the "market value of the fish, wildlife or plants," which is relevant under 2Q2.1(b)(3)(A), not the market value of an Alaskan outdoor experience. Accordingly, the restitution cost is the best "reasonable estimate" of the market value of the bears at issue in this case.[4]

---

[4]    *United States v. Atkinson*, 966 F.2d 1270 (9th Cir. 1992) and *United States v. Fejes,* 232 F.3d 696 (9th Cir 2000) are irrelevant to the market value of wildlife for the purposes of the Sentencing Guidelines. In *Atkinson*, the Ninth Circuit rejected the defendant's attempt to avoid the $350 value of the wildlife Lacey Act threshold by relying on Montana's $300 fine for illegally killing a deer. *Id.* at 1273. The market value threshold for Lacey Act liability is different than the market value for the purposes of sentencing. The Lacey Act does not reference "restitution cost" as reliable information indicating a reasonable estimate. The Sentencing Guidelines do. Accordingly, while restitution cost may not be an appropriate measure of value for the Lacey Act market value threshold, restitution cost is an appropriate estimate of fair market value for sentencing. In addition, the concern in *Atkinson*, that the fines established in Montana did not bear any resemblance to the actual market value of the animals listed is not present in this case. First, the values listed in AS 16.05.925 are specifically listed as restitution values, not fines. Second, the wide range and variance of values for different animals ($400 for a deer while $3,000 for musk oxen) demonstrates that the legislature determined

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

The cost of the hunts, on the other hand, is a completely unreliable estimate of the market value of the wildlife. First, and most importantly, the value of a guided hunt represents the value of a hunt, not wildlife. Second, countless variables factor into the price of a black bear hunt. Some obvious factors include: (1) the ratio of clients per guide, (2) the time of year and hide quality, (3) the quality and nature of lodging (e.g., lodge, on a boat, tent), (4) whether air transport is included, (5) the area of the hunt, (6) the number of days of the hunt, (7) whether the hunt is the main purpose of the trip or an add-on to a fishing trip, (8) the quality and variety of tangential services provided (e.g., packing, food preparation, sleeping arrangements, etc.), and (9) the individual guide's "success rate." All of these factors, and countless others, dictate the cost of a hunt for Alaska black bears.

The cost of a black bear hunt depends on any number of factors that have absolutely no bearing on the value of an Alaska black bear. Accordingly, the cost of any given black bear hunt is a remarkably poor and entirely unreliable estimate of the market value of a black bear.

Second, under U.S.S.G. § 2Q2.1(b)(3)(A), the correct market value of the fish, wildlife or plants in this case is either $2,400, $3,600, $4,800, or $6,000, depending upon the number of bears attributed to Mr. Veys at his sentencing. This figure is calculated by

---

appropriate values for each animal. Third, the restitution amounts were set in 1996, only five years before the last Alaska black bear at issue was taken. More importantly, however, the holdings of *Atkinson* and *Fejes* are simply not applicable to the calculation of market value of wildlife for the purposes of sentencing, given the Sentencing Guidelines explicit approval of restitution cost as a reasonable estimate of the fair market value of wildlife.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

multiplying the number of bears taken by the market value of $600. A $3,600 market value results in a one point increase under §2Q2.1(b)(3(A) and a $6,000 market value results in a two-level increase in the offense level. If the cumulative market value of the wildlife at issue is greater than $5,000, § 2Q2.1(b)(3)(A) provides that the offense level be increased by the number of levels noted in § 2B1.1 (Fraud table). A market value between $5,000 and $10,000 results in a two-level increase under the Fraud table.

### 3.    If the cost of the hunt is used, the value paid only for hunting the black bears must be used.

If the Court determines, however, that the cost of the hunt provides a better estimate of the value of the wildlife than the restitution value set by the State of Alaska, the Court must adopt a value that reflects the amount paid for hunting black bears, not the amount paid for the entire experience at Mr. Veys's lodge at Pybus Point. Mr. Veys ran a fishing lodge and was known by his customers and colleagues as a fishing lodge operator. The hunting operations by Mr. Jairell were a limited add-on operation to the standard fishing and lodge services provided for years by Mr. Veys. The full price paid by the guests grossly inflates the cost of the bear hunt and is not a reasonable estimate of the market value of the black bear hunts at issue.

By analogy, if a cruise company were to offer one-day black bear hunts in Southeast Alaska as an add-on activity to an Inside Passage cruise, surely the government would not contend that the entire cost of the cruise (including the black bear hunt) is the value of the wildlife. Mr. Veys situation is similar. He runs a fishing lodge where guests also have the opportunity to engage in hunting. The value of the fishing lodge operation

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 31*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

cannot be included in any calculation of the cost of the bear hunts.  The case law does not refute this common sense argument.  The government will certainly cite to *United States v. Atkinson*, 966 F.2d 1270 (9th Cir. 1992), but *Atkinson* does not require the imposition of an unjust sentence based on a falsely inflated value.  First, the Court's concern in *Atkinson* was determining the market value for the purposes of the Lacey Act $350 threshold.  *Id.* at 1273.  The *Atkinson* Court did not address the Sentencing Guideline's specific requirement to determine the value of the "wildlife."  Second, in *Atkinson*, the hunters only paid for a hunting trip.  Atkinson's fee was only for hunting.  While the fee included meals and lodging, hunting was the only purpose.  The hunting was not an "add-on" to a fishing trip.  *Atkinson* is, therefore, easily distinguished and entirely irrelevant to the case at hand.

There are no published analogous cases applying the Sentencing Guidelines.[5]  In its objection to the sentencing memorandum, the Government pointed to three cases:

---

[5]   In *United States v. Kayser*, 200 WL 328121 (9th Cir. 2000) (unpublished), the Ninth Circuit cursorily addressed the issue in an unpublished memorandum disposition.  This memorandum disposition has no value as precedent and cannot even be cited to the Ninth Circuit because it was issued pursuant to Ninth Circuit Rule 36-3.  Regardless, *Kayser* has no relevance to this case.  The Court in *Kayser* simply made a reasonable estimate of market value using the "acquisition and preservation" cost for illegally taken mountain lions because market value was difficult to ascertain.  The Court was not presented with a more accurate restitution value as in this case.  Nor was the Court presented with an obvious split between hunting services and lodge and fishing services as in this case.  The hunters paid for a mountain lion hunt and nothing else.  *Id.* at *3.  Indeed, the panel in *Kayser* seemed to indicate that had their been any other evidence of the appropriate market value, they would have been inclined to use that value.  *Id.* at *3 (""Neither the appellants nor the government put on expert testimony regarding the market value of the lions. The district court therefore took into account the fact that Reiber and Dietrich each paid appellants $2000 for their unsuccessful 1996 hunt.").  The *Kayser* panel would have

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*United States v. Eyoum*, 84 F.3d 1004 (7th Cir. 1996); *United States v. Borden*, 10 F.3d 1058 (4th Cir. 1993) and *United States v. Norris*, 452 F.3d 1275 (11th Cir.).  None of these cases rebut the common sense conclusion that the inflated price in this case, which includes the price for fishing, should be the market value for the black bear hunts under the Sentencing Guidelines.  In *Eyoum*, the Seventh Circuit simply held that that the retail market value of illegally imported tortoises was the correct market value under U.S.S.G. § 2Q2.1(b)(3)(A), not the lower price that the defendant actually received.  *Eyoum*, 84 F.3d at 1008.  This is the appropriate result because § 2Q2.1(b)(3)(A) requires a determination of market value for the wildlife, not the amount received by the defendant for the wildlife, which could be nothing.  *Borden* is equally irrelevant.  In *Borden*, the Fourth Circuit held that the appropriate value was the market value of the illegally obtained mussel shells not the defendant's profit from the shells.  *Borden*, 10 F.3d at 1063.  Again this is simply the correct interpretation of U.S.S.G. § 2Q2.1(b)(3)(A)'s requirement to determine the "market value" of the fish, wildlife or plants.

Finally, the recent Eleventh Circuit case, *United States v. Norris*, is also irrelevant.  Norris smuggled illegal orchids into the United States by hiding them among legal orchids.  Norris argued that only the value of the illegal orchids should be counted for purpose of § 2Q2.1(b)(3)(A).  *Norris*, 452 F.3d at 1281.  The government argued that the entire orchid shipment should be valued because the false and misleading permit issued by the Convention on International Trade in Endangered Species of Wild Fauna and

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

likely been interested in restitution value or evidence showing the actual value of the hunting trip separated out from other services such as fishing.

Flora (CITES) for the shipment rendered the entire shipment illegal. *Id.* The Eleventh Circuit held that the term "market value" in §2Q2.1(b)(3)(A) should be based on the entire shipment because the legal orchids were an integral part of the conspiracy to import undocumented CITES-protected orchids into the United States. *Id.* at 1282. Critical to the court's determination was that the legal orchids were used to "avoid the detection of the undocumented orchids." *Id.* The facts of *Norris* completely distinguish it from this case. The fishing operations at Mr. Veys's lodge were completely legal and did not conceal or disguise anything, let alone hide any black bear hunting. *Norris* provides no reason to inflate the value of a black bear hunt by including non-hunting related fees.

The case law does not contradict the common sense approach of actually determining the cost of the hunting trip, and not including the entire cost of the fishing trip to Pybus Point Lodge. All the hunting trips were "add-ons." Any rational determination of market value of the wildlife based on the price of the hunting trip has to separate the cost of hunting from fishing. If the cost of the hunt is used as an estimate of the market value of the wildlife, the cost of the hunt must be isolated. To do otherwise, would erroneously and unfairly inflate the market value of the wildlife in this case.

### 4.    Only four bears should be attributed to Mr. Veys.

Finally, it is a factual matter how many of the black bear hunts in 2000-2001 should be attributed to Mr. Veys. Mr. Veys agrees that the September 2001 hunts (four bears) should be attributed to him. Mr. Veys disagrees that the hunts in 2000 or June 2001 should be attributed to him. In the 2000 hunts, the clients were simply at the lodge

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

to go fishing.  When the fishing turned very bad, Mr. Veys suggested that the clients could legally hunt black bears without a guide and Mr. Jairell could go with them. Unknown to Mr. Veys, Mr. Jairell required the three hunters to sign contracts stating that he was guiding them (which he could not legally do) and required the hunters to pay him $1,500.00.  This money went directly to Mr. Jairell.  There is no evidence that Mr. Veys was aware of these arrangements.  In 2000, two black bears were killed.  These bears should not be attributed to Veys.

The spring 2001 black bear hunts should also not be attributed to Mr. Veys. Mr. David Helmrick, a retired Fish and Wildlife officer, and lawfully registered big game guide was in the field and at Mr. Veys's lodge both before and after the alleged black bear hunts.  Mr. Veys was told that these hunts were going to be conducted through Mr. Helmrick, which was legal.  Because Mr. Veys reasonably believed that the registered guide was going to be contracting with these clients, Mr. Veys should not be assessed with the market value of these hunts.  On the hunt conducted from May 31 to June 7, two bears were taken and on the hunt conducted from June 5 to June 8, two additional bears were taken.  These four bears taken in spring 2001 should not be attributed to Mr. Veys.

Mr. Veys acknowledges that he should be held responsible for the four bears killed in the fall of 2001.  For these bears, he intends to make full restitution.

**D.    Adjustment for Role in the Offense:**

Mr. Veys objects to the failure of the Report to find that he is a minor participant in the course of this criminal activity.  *See* Report at p.12, ¶ 51.  Alan Veys is entitled to a

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

two-point reduction as a minor participant in the criminal activity pursuant to U.S.S.G. § 3B1.2. Section 3B1.2 provides:

> (a)    If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

> (b)    If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

An adjustment because the defendant's participation was "minimal" or "minor" requires that the defendant be "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, *cmt*. 3(a). The Application Notes advise that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. U.S.S.G. § 3B1.2, *cmt*. 4. A minor participant is one "who is less culpable than most participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, *cmt*. 5; *see also United States v. Hatley*, 999 F.2d 292, 395 (9th Cir. 1993). (quoting U.S.S.G. § 3B1.2, *cmt*. 5). The relevant comparison is the scope of the defendant's participation in relation to that of his co-conspirators. *United States v. Benitez*, 34 F.3d 1489, 1498 (9th Cir.1994). The defendant must be "substantially" less culpable than his co-conspirators. *United States v. Johnson*, 297 F.3d 845, 874 & n.37 (9th Cir.2002).

### 1.    Without a minor role adjustment, Veys will unjustly receive no recognition for less culpable mental state.

The Government will likely argue that a minor role reduction is not appropriate because Mr. Veys's was initially charged with Lacey Act felonies and those charges were was reduced to a lesser included misdemeanor offense, while Mr. Veys's co-defendant,

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

James Jairell was not charged with a lesser-included offense. Such an interpretation is incorrect as a matter of law. The Application Notes to § 3B1.2 explain:

> If a defendant has received a lower offense by virtue of being convicted of an offense significantly less serious than warranted by his actual criminal conduct, a reduction for a mitigating role under this section ordinarily is not warranted because such defendant is not substantially less culpable than a defendant whose only conduct involved the less serious offense. § 3B1.2 *cmt* 3.

In this case, Mr. Veys pleaded guilty to a negligent conspiracy. A Lacey Act felony is a specific intent crime that requires the Government prove intentional and knowing conduct. Mr. Veys pleaded guilty to a charge that he entered a conspiracy to violate the Lacey Act by assisting in transporting black bears in interstate commerce that in the exercise of due care he should have known were taken on illegally guided hunts. Mr. Veys's actual conduct does not warrant a more serious charge. The Government cannot prove that he was guilty of a Lacey Act felony. Instead, the Lacey Act negligent misdemeanor is only the appropriate charge for Veys' actual conduct.

The reduction of the charge to a misdemeanor has no practical effect on the application of the Sentencing Guidelines. While the misdemeanor charge limits Veys's sentence to a year, under the Sentencing Guidelines, his sentence is calculated exactly in the same manner for a Lacey Act felony under § 2Q2.1(b)(3)(A) as for a Lacey Act misdemeanor. The reduction in charges to a negligent misdemeanor, therefore, fails to account for any mitigating or minor participant role in this case. Failure to make an adjustment for a minor participating role in the offense will result in inequitable sentencing because Mr. Veys's is substantially less culpable than his co-conspirator.

DORSEY &
WHITNEY LLP
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Without a minor participant reduction Mr. Veys receive no recognition for his extremely limited role in the conspiracy.

###### 2.    Veys is much less culpable than his co-conspirator Jairell.

Veys's role in the conspiracy was extremely limited in comparison to his co-conspirator Jairell. The sole basis for criminal liability in this case is that the hunts were illegally guided under Alaska law because the hunts did not involve a registered guide. Veys pleaded guilty to conspiring with Jairell to knowingly transport, in interstate commerce, the trophy parts of black bears when in the exercise of due care, Veys should have known that the bears had been sold in violation of Alaska law.

Veys did not guide a single hunt. Veys had no direct knowledge that a registered guide was not involved in the hunts. However, Jairell always knew that the hunts did not involve a registered guide as required by Alaska law. This is because Jairell guided the hunts. Veys did not. Jairell was in the field. Veys was not. Veys did nothing more than provide a boat and lodge with food to Jairell and the guests. Veys's role at the lodge was the same whether guests were fishing or hunting on a particular day. Veys did **not** accompany the hunters on any of the hunts. Veys stayed at the fishing lodge.

Veys had an agreement with Jairell to split the bear-hunting portion of the fees between Jairell and any registered guide(s) involved in the bear hunts. Veys did not actually know that a registered guide was not involved. Veys's portion of the fees were to pay for the lodging and fishing and had nothing to do with the hunting. Jairell intentionally violated Alaska's big game guiding statutes. Veys, on the other hand, merely helped transport bear parts that in the exercise of due care, he should have known

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

were taken on a hunt that was illegally guided. Jairell's mental state – intentional and knowing, is much more culpable than the mental state of Veys – negligent. Veys acted as a booking agent for these hunts when he was at shows promoting his fishing lodge. Veys did not contract for the hunts, nor did he guide the hunts. He trusted that Jairell was involving a registered guide in the hunts and at worst Veys was negligent in his actions. This conduct makes Veys substantially less culpable than Jairell.

In addition, Jairell intentionally and fraudulently falsified documents on multiple occasions. Jairell masterminded a scheme to engage in illegal guiding, which included falsifying and forging documents. As part of this scheme Jairell purposely manipulated Veys, a man whose mental condition leaves him dangerously susceptible to manipulation. Jairell abused Veys's trust and convinced Veys to sign documents that Jairell then used to further his illegal objectives. Veys was an unfortunate casualty in Jairell's criminal scheme. Accordingly, Veys is substantially less culpable than his co-conspirator.

For all of these reasons, a two-point reduction for being a minor participant is warranted under U.S.S.G. § 3B1.1.

### E.    Victim Related Adjustment:

Mr. Veys agrees with the Report that there are no victim related adjustments applicable to this case.

### F.    Adjustment for Obstruction of Justice:

Mr. Veys agrees with the Report that there should be no adjustment for obstruction of justice.

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum - 39*
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

### G.     Adjusted Offense Level:

Based upon the analysis above, Mr. Veys contends that his base offense level is either a seven or an eight.

### H.     Downward Adjustments:

Additionally, regardless of how the court applies the Sentencing Guidelines, the Court should consider a downward departure under U.S.S.G. § 5K2.0.  Because the Guidelines are now advisory, § 5K2.0 departures and sentences outside of the Guidelines range are reviewed for reasonableness.  *United States v. Mohamed*, 459 F.3d 979, 986-987 (9th Cir. 2006).  While the Sentencing Guidelines system of downward departures is not to be ignored, the departures system is no longer mandatory and the Court's departure decisions are only overturned if the ultimate sentence is unreasonable.  *Id.* at 987.

Section 5K2.0 allows a downward adjustment when a case presents "atypical" features.  An "atypical" case is one in which the defendant's "conduct significantly differs from the norm," or the "heartland" of typical cases established by the Commission for each guideline.  While Mr. Veys believes that his sentence is best analyzed under a reasonable sentence under the § 3553(a) factors, a downward departure under § 5K2.0 is also appropriate.  A departure can be warranted "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."  § 5K2.0(a)(2)(B).

Mr. Veys's case is such an exceptional case.  Two facts require a downward departure.  First, Mr. Veys's criminal conduct involved only negligence, which the guidelines utterly fail to take into consideration.  The Guidelines would sentence

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557

Mr. Veys exactly the same as if he had been convicted of an intentional Lacey Act felony.   A downward departure is necessary to prevent inequitable punishment, i.e., punishing intentional and negligent conduct the same.   Second, Mr. Veys's was instrumental in bringing about the conviction of Mr. Jairell.   Mr. Veys's built the case against Mr. Jairell by providing exculpatory evidence that implicated Mr. Jairell at the risk of losing the "surprise factor" at trial.   He also disclosed his Forensic Document Examiner's Report, which closed the case against Mr. Jairell.   At the risk of his own defense, Mr. Veys helped the government with its prosecution of Mr. Jairell and demonstrated the role Mrs. Jairell had in this criminal enterprise.   Neither of these two exceptional facts has been sufficiently taken into account in the Guidelines.   Accordingly, a § 5K2.0 downward departure is necessary.

## CONCLUSION

For all of the reasons above, Mr. Veys urges the Court to consider a probationary sentence.   A probationary sentence, along with conditions agreed to by the parties, is entirely reasonable under the circumstance.   A probationary sentence with a short period of home confinement in the range of two (2) months is the maximum sentence justified in this case.   Given the fact that Mr. Veys has successfully been out on bail for a period of almost one year, a period of probation longer than 18 months is unnecessary. Mr. Veys believes that a probationary sentence is appropriate under both the 18 U.S.C. § 3553 factors and the Sentencing Guidelines.

**DORSEY &**
**WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK  99501
(907) 276-4557

*Defendant Veys's Sentencing Memorandum* - 41
*USA v Veys, et al.,* Case No. 1:06-CR-00003-HRH-PMP
4811-5440-7681\3\480253\00002

DATED this 26th day of July, 2007, at Anchorage, Alaska.

DORSEY & WHITNEY LLP

By:     /s/ Allen F. Clendaniel
　　　　Allen F. Clendaniel, ABA #0411084
　　　　DORSEY & WHITNEY LLP
　　　　1031 West Fourth Avenue, Suite 600
　　　　Anchorage, AK 99501-5907
　　　　Telephone:     (907) 276-4557
　　　　Facsimile:     (907) 276-4152
　　　　E-mail: clendaniel.allen@dorsey.com

　　　　Brent R. Cole, ABA #8606074
　　　　MARSTON & COLE, PC
　　　　745 W. 4th Avenue, Suite 502
　　　　Anchorage, AK 99501
　　　　Telephone:     (907) 277-8001
　　　　Facsimile:     (907) 277-8002

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 26th, day of
July, 2007,a copy of the foregoing document was served
on:

Robert S. Anderson
Steven E. Skrocki
Deborah M. Smith
Wayne D. Hettenbach

by first class regular mail, if noted above, or by electronic
means through the ECF system as indicated on the Notice
of Electronic Filing.

　　　　/s/ Allen F. Clendaniel
　　　　Allen F. Clendaniel
　　　　Dorsey & Whitney, LLP

**DORSEY &
WHITNEY LLP**
1031 West 4th Avenue,
Suite 600
Anchorage, AK 99501
(907) 276-4557