05/08/2007 18:03 FAX  9072716904          US PROBATION                                    ☑005/034

Presentence Report - Alan J. Veys                                                    **DRAFT**

**PART A.    THE OFFENSE**

<u>Charge(s) and Conviction(s)</u>

1.    On July 19, 2007, a 14-count Indictment was filed with the U.S. District Court for the
      District of Alaska under case number 1:06-cr-00003-001 HRH charging **Alan J. Veys (Veys)**
      and James E. Jairell (Jairell) with Count 1, Conspiracy in violation of 18 U.S.C. § 371 and
      18 U.S.C. § 2; Counts 2-5, Wildlife Trafficking in violation of 16 U.S.C. §§ 3372(a)(2)(A),
      3373(d)(1)(B) and 18 U.S.C. § 2; Counts 6-13, False Statement Concerning Wildlife in
      violation of 16 U.S.C. §§ 3372(d)(2), 3373(d)(3)(A)(ii) and 18 U.S.C. § 2; and Count 14,
      Forfeiture Allegation, 16 U.S.C. § 3374(a)(2).  Veys is named in Counts 1 - 5 of the
      Indictment.  Jairell is named in Counts 1-13 of the Indictment. Veys was summoned to
      appear before the Honorable Philip M. Pallenberg, U.S. Magistrate Judge, for arraignment
      on September 21, 2006.

2.    On September 21, 2006, Veys appeared for arraignment on the Indictment before U.S.
      Magistrate Judge Pallenberg.  Attorney Brent Cole appeared on behalf of the defendant.
      Veys was advised of the nature of the charges, the associated penalties, and his general
      rights, entered pleas of not guilty to Counts 1-5, denied Count 14, and was released on his
      own recognizance under pretrial supervision with the following conditions.

      Appear at all proceedings as required and surrender for service of any sentence imposed

      Report as instructed to U.S. Pretrial Services Office

      Surrender any passport

      If leave state, inform counsel and pretrial services of whereabouts

3.    On February 21, 2007, Veys' counsel filed notification of the defendant's intention to enter
      a plea of guilty to a misdemeanor charge and requested to proceed in Juneau before
      Magistrate Judge Pallenberg.  On February 22, 2007, U.S. District Court Judge H. Russel
      Holland issued an order transferring Veys case to Juneau before Magistrate Judge Pallenberg.

4.    On February 27, 2007, a one-count Information was filed under case number 1:06-cr-00003-
      001 HRH in the U.S. District Court for the District of Alaska charging **Alan J. Veys** with
      Count 1, Conspiracy in violation of 18 U.S.C. § 371 and 18 U.S.C. § 2.

5.    On March 1, 2007, **Veys** appeared before the Honorable Philip M. Pallenberg, U.S.
      Magistrate Judge, for Arraignment on the Information and an Entry of Plea Hearing.  The
      Court advised **Veys** of the nature of the charge, the associated penalties, and his general
      rights. **Veys** entered a plea of guilty to Count 1 of the Information; the Court accepted the
      plea, and referred **Veys** to the Probation Office for a presentence investigation.[1]  The
      defendant's release under pretrial supervision was continued.

---

[1] The government is to move for dismissal of the felony Indictment at the time of sentencing.

May 8, 2007                                    1

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

**Exh. A, p. 1 of 30**

Presentence Report - Alan J. Veys               **DRAFT**

6.     Imposition of sentence is set for June 6, 2007, before Magistrate Judge Pallenberg.

7.     According to the chronological records of U.S. Pretrial Services, the defendant has committed no known violations of his conditions of release.

<u>Background Information</u>

8.     The State of Alaska recognizes and licenses certain distinct categories of big-game guides, including the "assistant guide," the "class-A assistant guide" and the "registered guide."

9.     The registered guide who contracts to guide or outfit a big-game hunt is required to plan, direct and monitor the big-game hunting services provided to the client. 12 AAC 75.240(a). The registered guide who contracts for the hunt must be physically present in the field with the client at least once during the contracted hunt. AS 08.54.610(e)(1), 12 AAC 75.250(a).

10.    Neither a class-A assistant guide nor an assistant guide may contract to guide a big-game hunt. AS 08.54.720(a)(14); AS 08.54.620(b)(1), 630(b)(1). A class-A assistant guide or assistant guide shall be employed by, and under the supervision of, a registered guide who has contracted with the client for whom the class-A assistant guide or assistant guide is conducting the hunt. AS 08.54.620(b)(2), 630(b)(2). It is unlawful in Alaska for a class-A assistant guide or an assistant guide to knowingly guide a hunt except while employed and supervised by a registered guide. AS 08.54.720(a)(3).

11.    "Guide" means to provide, for compensation or with the intent or with an agreement to receive compensation, services, equipment, or facilities to a big-game hunter in the field by a person who accompanies or is present with the big game hunter in the field either personally or through an assistant. AS 08.54.790(7). Such services include:

    (A)    contracting to guide or outfit big game hunts;
    (B)    stalking, pursuing, tracking, killing or attempting to kill big game;
    (C)    packing, preparing, salvaging or caring for meat, except that which is required to properly and safely load the meat on the mode of transportation being used by a transporter;
    (D)    field preparation of trophies, including skinning and caping;
    (E)    selling, leasing, or renting goods when the transaction occurs in the field;
    (F)    using guiding or outfitting equipment, including spotting scopes and firearms, for the benefit of a hunter; and
    (G)    providing camping or hunting equipment or supplies which are already located in the field.

12.    "Outfit" means to provide, for compensation or with the intent to receive compensation, services, supplies, or facilities to a big-game hunter in the field, by a person who neither accompanies nor is present with the big game hunter in the field either personally or by an assistant. AS 08.54.790(8).

May 8, 2007                   2

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

05/08/2007 18:04 FAX 9072716904        US PROBATION                                    ☑007/034

Presentence Report - Alan J. Veys                                              **DRAFT**

13.   It is the responsibility of the registered guide, class-A assistant guide and assistant guide to, among other things:

   -ensure that the appropriate tags are attached to any game taken by a client and all game is sealed or marked as required by 5 AAC 92. 12AAC 75.310(a)(1);

   -advise clients and employees involved in a hunt of all applicable state and federal statutes and regulations related to hunting, land use, wildlife, big-game hunting services, and conservation. 12 AAC 75.310(a)(8).

14.   The State of Alaska "Transporter License" authorizes non-guides to provide transportation services and accommodations to big-game hunters in the field at a permanent lodge, house or cabin owned by the transporter. AS 08.54.650. A licensed transporter (unless the transporter is also a guide) may not provide big-game hunting services, and the transporter must submit an annual Transporter Activity Report to the state which describes the details of transportation services provided under the license. AS 08.54.650.

15.   "Big Game Hunting Services" means a service for which the provider of the service must obtain a registered guide, class-A assistant guide, or assistant guide license; "big-game hunting services" includes guiding services and outfitting services. AS 08.54.790(2).

16.   The skin and skull of a black bear taken in Alaska Game Management Units (GMU's) encompassing Admiralty Island, Kupreanof Island and Kuiu Island must be presented to a representative of the Alaska Department of Fish and Game for sealing within a specified time after the animal is killed. 5 AAC 92.165. A person who kills a bear in a Management Unit where sealing is required, but is unable to present the skin and skull in person, must complete and sign a temporary sealing certificate and ensure that the completed temporary sealing certificate, along with the bear skin and skull, are presented to a representative of the Alaska Department of Fish and Game within 30 days after the taking. 5 AAC 92.165(d). A person may not falsify any information required on the sealing certificate or temporary sealing certificate provided by the department. 5 AAC 92.165(f).

   The Offense Conduct

17.   The following information was obtained from reports of the U.S. Fish and Wildlife Service (USFWS), U.S. Forest Service (USFS), the Alaska State Troopers, Bureau of Wildlife Enforcement (AST), the charging documents in the instant offense, and from other sources as noted.

18.   **Veys** owns and operates Lone Eagle Resorts LLC, dba Pybus Point Lodge. Pybus Point Lodge is located on Cannery Cove within Pybus Bay, on Admiralty Island, Alaska. Pybus Point Lodge is approximately 90 miles south of Juneau, Alaska, and the only way to reach the lodge is by boat or floatplane.

19.   Admiralty Island is known as having one of the highest population densities of brown bears in North America, and big-game hunters seeking to hunt brown bears come to Admiralty

May 8, 2007                              3

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

05/08/2007 18:05 FAX  9072716904                US PROBATION                                ☑ 008/034

Presentence Report - Alan J. Veys                                                    **DRAFT**

Island from points across the globe. There are no black bears on Admiralty Island. With few exceptions, lands upon Admiralty Island are National Forest lands administered by the Tongass National Forest. One of these exceptions is the privately owned inholding which houses Pybus Point Lodge.

20. Across Frederick Sound from Pybus Point Lodge lie Kupreanof Island Kuiu Island. Both islands are home to large populations of trophy-quality black bears, and, like brown bears on Admiralty Island, hunters from all over the world come to Kupreanof Island and Kuiu Islands seeking trophy black bears. There are no brown bears on either Kupreanof Island or Kuiu Island. Lands upon Kuiu Island are National Forest lands, and with the exception of lands privately held by the Kake Tribal Corporation, an Alaska Native Corporation, lands upon Kupreanof Island are largely National Forest lands as well. The Kake Tribal Corporation does not allow members of the public at large to hunt on Corporation lands, and the Kake Tribal Corporation also does not allow commercially guided hunting activities on Corporation lands.

21. Hunters typically pay upwards of ten thousand dollars for a guided hunt for brown bears on Admiralty Island, and upwards of four thousand dollars for a guided black-bear hunt on Kuiu or Kupreanof Islands.

22. As a result of operating Pybus Point Lodge, Veys has an extensive client base of fishing clients, many of whom are also hunters. By virtue of the geographic location of Pybus Point Lodge, Veys could offer unique hunting experiences for both brown and black bears to his clients that they could not otherwise obtain.

23. While on a hunting trip to Wyoming in 1997, Veys met Jairell. In 1998, Jairell booked a guided fishing trip at Pybus Point Lodge. At some point during this time, Jairell and Veys developed a friendship, and subsequently developed a business relationship.

24. In 1999, Jairell applied for, and was issued, an assistant guide license in Alaska. On September 11, 1999, Jairell purchased a non-resident Alaska hunting and sport fishing license, using the business address for the PYBUS POINT LODGE as the address he listed when purchasing the license.

25. Beginning about February 2000, Veys attended various sports shows in Nevada and elsewhere and, while promoting the services offered at Pybus Point Lodge, contracted with several clients for multi-day bear-hunting trips in Alaska to occur during the Spring of 2000, during which the clients would stay at the Pybus Point Lodge and be guided by Jairell. Since neither Veys nor Jairell were licensed Registered Guides in Alaska, they could not legally advertise or represent to be an outfitter or guide, nor could they offer to provide big game guiding and/or outfitting services.[2] Jairell and Veys had agreements with registered guides Larry Cobb (Cobb), Larry Hooton (Hooton) and Dave Helmick (Helmick) to "cover" guided

---

[2] It is noted that other hunts *were* conducted with the involvement of a licensed registered guide, but were conducted unlawfully nonetheless because neither Veys nor Jairell were licensed registered guides. No hunts that involved a licensed registered guide were charged.

May 8, 2007                                    4

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or rediscloure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

bear hunt sold by Veys and Jairell. In exchange for fees paid by Veys, Cobb, Hooton and
Helmick signed legally required Big Game Guide Hunt Records as the contracting licensed
Registered Guide for these hunts.

26.     On April 20, 2000, Jairell purchased Alaska Resident Sport Fishing and Hunting license
        #0129752. Veys, an authorized Alaska hunting and fishing license vendor, issued the license
        to Jairell, and signed the license as the issuing agent. On the resident hunting license
        application, Jairell used the business address for the Pybus Point Lodge as his residence
        address. Jairell claimed to have been an Alaska Resident for one year and two months.[3]

27.     On April 20, 2000, Jairell submitted an application, in person, for a Class A assistant guide
        license to the State of Alaska, Division of Occupational Licensing. On the license
        application, Jairell provided fraudulent information claiming he was a resident of Southeast
        Alaska in the Admiralty Island and Kupreanof Island areas. Jairell also claimed he had 15
        years of qualifying hunting experience in this area. The subsequent investigation determined
        Jairell was a resident of Wyoming, and at the time he submitted his Alaska Class A assistant
        guide license application, had only one (1) year of hunting experience that would qualify
        towards the Class A assistant guide license.

28.     Included within Jairell's Class-A assistant guide license application package was a fraudulent
        State of Alaska, Division of Occupational Licensing "hunting experience and residency"
        affidavit signed by Veys on April 20, 2000. The affidavit certified that Jairell had 15 years
        of hunting experience in Southeast Alaska within GMU 4. The information in this affidavit
        supported the fraudulent residency and years of hunting experience claims made by Jairell
        in the Class-A assistant guide license application he submitted to the State of Alaska. The
        affidavit signed by Veys was sealed on April 20, 2000 by notary public Vicki Dunayski, who
        was employed by the State of Alaska, Division of Occupational Licensing.[4]

29.     On April 21, 2000, Jairell submitted three additional false affidavits, in person, to the State
        of Alaska, Division of Occupational Licensing. These affidavits are as follows:

                Valerie Svendsen (Svendsen), Veys' assistant at the Pybus Point Lodge and
                close friend, and Hooton each signed fraudulent "hunting experience and
                residency" affidavits certifying that Jairell resided in and had 15 years of
                hunting experience in Southeast Alaska in GMU's 3 and 4. The information
                in these affidavits supported the fraudulent residency and years of hunting
                experience claims made by Jairell in the Class-A assistant guide license
                application he submitted to the State of Alaska. These affidavits, dated April

---

    [3] On October 6, 2005, Jairell was convicted of two criminal counts of unsworn falsification related to his
residency and years of hunting experience claims on his Class-A assistant guide license application (see following),
and his residency claims on his Alaska hunting and fishing license application.

    [4] According to Veys' defense counsel, the information relating to Jairell's years of qualifying hunting
experience was not included in the document at the time Veys signed the document.

May 8, 2007                                  5

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

05/08/2007 18:06 FAX  9072716904                 US PROBATION                                    @010/034

Presentence Report - Alan J. Veys                                    **DRAFT**

       20, 2000, were both signed by Veys as a witness.[5]

       On April 21, 2000, Veys signed a second fraudulent "hunting experience and residency" affidavit certifying that Jairell had 15 years of hunting experience in Southeast Alaska within GMU 3. The information in this affidavit supported the fraudulent residency and years of hunting experience claims made by Jairell in the Class-A assistant guide license application he submitted to the State of Alaska. This affidavit was also sealed on April 21, 2000 by notary public Vicki Dunayski.[6]

30.    U.S. Secret Service handwriting experts, and defense handwriting expert David Moore, examined these affidavits and determined the following.

       The April 20, 2000 affidavit signed by Veys bears Veys' genuine handwriting. Veys wrote all handwriting on the affidavit except for the notary information and the name "James E. Jairell" that is written at the top of the form.

       The April 21, 2000 affidavit signed by Veys bears Veys' genuine signature, printed name, and date. Veys did not write the notary information or any other hand-written information on the form.

       Veys' genuine signature, name, and date are written on the witness lines on the Hooton and Svendsen April 20, 2000 affidavits.[7]

31.    On or about April 21, 2000, Jairell obtained a Class-A assistant guide license from the State of Alaska on the basis of false Hunting Experience and Residency affidavits signed by Veys, Svendsen, and Hooton.[8]

32.    On April 21, 2000, Veys, d/b/a Pybus Point Lodge, applied for a transporter license, in person, from the State of Alaska, Division of Occupational Licensing. Veys submitted this application on the same date and at the same location as Jairell submitted the three additional

---

    [5] According to Veys' defense counsel, the information relating to Jairell's years of qualifying hunting experience was not included in the documents at the time Veys, Svendsen, or Hooton signed the documents.

    [6] According to Veys' defense counsel, the information relating to Jairell's years of qualifying hunting experience was not included in the document at the time Veys signed the document.

    [7] As reflected above, according to Veys' defense counsel, the information relating to Jairell's years of qualifying hunting experience was not included in the documents at the time Veys, Svendsen, or Hooton signed the documents.

    [8] As stated above, according to Veys' defense counsel, the information relating to Jairell's years of qualifying hunting experience was not included in the documents at the time Veys, Svendsen, or Hooton signed the documents.

May 8, 2007                           6

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

05/08/2007 18:06 FAX  9072716904          US PROBATION                    ☑ 011/034

Presentence Report - Alan J. Veys                                    DRAFT

aforementioned false affidavits for his Class-A assistant guide license application. Veys'
license application was approved, and a transporter license was issued to Veys (Pybus Point
Lodge) on April 21, 2000. This license had an expiration date of December 31, 2001.

33.   On or about June 3 to 4, 2000, Veys and Jairell, without the required involvement of a
      registered guide, arranged and conducted guided black bear hunts for three Pybus Point
      Lodge clients. Each of the three clients paid Veys (Pybus Point Lodge) approximately
      $3,695.00 for their guided black bear hunting and fishing trip, $1,500 each of which was for
      a two-day black bear hunt. Veys provided lodge boats and boat captains for the guided hunts
      and provided lodge facilities and equipment for the hunt, which resulted in two of the clients
      each killing a black bear while being guided on the hunt. Veys also provided facilities and
      equipment for processing the bears and trophy parts of bears and preparing bear hides and
      skulls for shipping to the client's homes in Wisconsin.

34.   Veys did not file a Transporter Activity Report with the State of Alaska at any time for the
      year 2000.

35.   In February of 2001, at a sports show in Reno, Nevada, Veys sold a combination black bear
      hunting and fishing trip to a woman, and a fishing trip to her husband. Veys told the couple
      that the wife's bear hunt would be based from the Pybus Point Lodge, and said Jairell would
      be her bear hunting guide. Veys charged the wife $4,000.00 for her black bear hunt, and
      charged her husband $2,500.00 for his fishing trip. On or about September 4 - 6, 2001, Veys
      and Jairell conducted a guided black bear hunt for the wife. Veys provided lodge boats and
      boat captains for the guided hunts and provided lodge facilities and equipment for the hunt.
      Veys also provided facilities and equipment for processing the bears and trophy parts of
      bears and preparing bear hides and skulls for shipping to the clients' home. Jairell directed
      the Lodge boat to Kake, acquired a vehicle, drove the hunter in areas he chose on Kupreanof
      Island looking for bears, advised her whether or not to shoot a particular bear, skinned and
      deheaded the bear killed by the hunter, and transported the bear skin and skull from the kill
      site to Pybus Point Lodge, where he removed the skull, fleshed the skull and hide, salted the
      hide, advised the hunter about what information to write on a temporary bear sealing
      certificate, filling in some parts of the certificate himself, and later transported or arranged
      the transport, of the bear skin and skull for sealing and shipment from Alaska to Washington.
      No registered guide was involved in the hunts of these two Georgia clients. The wife left her
      bear hide and skull at the Pybus Point Lodge with an agreement that Veys and Jairell would
      get the bear sealed at the Alaska Department of Fish & Game (as required by law) and then
      ship the bear hide and skull to her taxidermist in Washington. On September 26, 2001,
      Jairell then submitted, to the State of Alaska, a sealing form which falsely reported that the
      black bear killed by the Washington hunter was killed on a non-guided hunt. Also on
      September 26, 2001, Veys and Jairell transported, or caused to be transported, the
      Washington client's bear hide and skull from Alaska to Washington.

36.   In February of 2001, Veys sold a combination black bear hunting and fishing trip to a
      Georgia family. The client was to hunt black bears and fish, while his family was fishing
      only. Veys told the client the bear hunt would be based from the Pypbus Point Lodge and
      that Jairell, who was also at the sports show where the trip was sold, would be his bear

May 8, 2007                              7

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

05/08/2007 18:06 FAX 9072716904      US PROBATION        ☑ 012/034

Presentence Report - Alan J. Veys                                  **DRAFT**

hunting guide. After booking the hunting and fishing trip, the client decided to have his son hunt black bear as well. The client paid Veys (Pybus Point Lodge) $4,000.00 for his hunt, and paid approximately $2,195.00 for his son's fishing trip, plus an additional undetermined amount for the bear hunt. On or about June 5 - 8, 2001, Veys and Jairell conducted guided black bear hunts for the client and his son. Veys provided lodge boats and boat captains for the guided hunts and provided lodge facilities and equipment for the hunt. Veys also provided facilities and equipment for processing the bears and trophy parts of bears and preparing bear hides and skulls for shipping to the client's home. On these hunts over three-day period, Jairell directed the Lodge boat to Kake, acquired a vehicle, drove the hunters in areas he chose on Kupreanof Island looking for bears, advised the hunters whether or not to shoot a particular bear, skinned, deheaded and partially butchered the bear killed by the elder hunter, transported the bear skin and skull from the elder hunter's bear, and whole bear shot by the younger hunter, from the kill sites to Pybus Point Lodge, where he removed the skulls, fleshed the skulls and hides, salted the hides, advised the hunters about what information to write on a temporary bear sealing certificates, filling in some parts of the certificates himself, and later transported or arranged the transport, of the bear skins and skulls for sealing and shipment from Alaska to Georgia. No registered guide was involved in the hunts of these two Georgia clients. The clients left their bear hides and skulls at the Pybus Point Lodge with an agreement that Veys and Jairell would get the bears sealed at the Alaska Department of Fish & Game (as required by law) and then ship the bear hides and skulls to the clients' home in Georgia. On June 7, 2001 and June 21, 2001, Jairell then submitted, to the State of Alaska, black bear sealing certificates falsely reporting that the black bears killed by the Georgia clients were killed on non-guided hunts. On or about June 21, 2001, Veys and Jairell transported, or caused to be transported, the Georgia clients' bear hides and skulls from Alaska to Georgia.

37.     In February of 2001, Veys sold combination black bear hunting and fishing trips to three Utah clients while at a sports show in Salt Lake City, Utah. Veys told the clients the bear hunt would be based from the Pybus Point Lodge, and said their bear hunting guide would be Jairell. On or about September 3 and 4, 2001, Veys and Jairell conducted guided black bear hunts for the three clients and each paid Veys (Pybus Point Lodge) $3,900.00 for their hunts. Veys provided lodge boats and boat captains for the guided hunts and provided lodge facilities and equipment for the hunt. Veys also provided facilities and equipment for processing the bears and trophy parts of bears and preparing bear hides and skulls for shipping to the clients' homes. On September 3, 2001, Jairell directed the boat to Kake, acquired a vehicle, drove the hunters in areas he chose on Kupreanof Island looking for bears, advised the hunters whether or not to shoot a particular bear, skinned and deheaded the bears killed by two of the hunters, and transported the bear skins and skulls from the kill sites to Pybus Point Lodge, where he removed the skulls, fleshed the skulls and hides, salted the hides, advised the hunters about what information to write on temporary bear sealing certificates, filling in some parts of the certificates himself, and later transported, or arranged the transport, of the bear skins and skulls for sealing and shipment from Alaska to Utah. On September 4, 2001, Jairell directed the Lodge boat to Kupreanof Island, guided the hunter to a logging road, located a black bear for the hunter to shoot, skinned and deheaded the bear killed by the hunter, and transported the bear skin and skull from the kill site to Pybus Point Lodge, where he removed the skull, fleshed the skull and hide, salted the hide, advised the

May 8, 2007                                8

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

hunter about what information to write on a temporary bear sealing certificate, filling in some parts of the certificate himself, and later transported, or arranged the transport, of the bear skin and skull for sealing and shipment from Alaska to Utah. No registered guide was involved in the hunts of these three Utah clients. The three clients left their bear hides and skulls at the Pybus Point Lodge with an agreement that Veys and Jairell would get the bears sealed at the Alaska Department of Fish & Game (as required by law) and then ship the bear hides and skulls to them in Utah. On or about September 26, 2001, Jairell made and submitted, or caused to be made and submitted, to the State of Alaska, sealing certificates falsely reporting that the black bears killed by the Utah hunters were killed on non-guided hunts. On or about September 26, 2001, Veys and Jairell transported, or caused to be transported, the Utah clients' bear hides and skulls from Alaska to Utah.

38.    In February of 2001, Veys and Jairell attended a sports show in Salt Lake City, Utah, where Veys sold combination black bear hunting and fishing trips in Alaska in 2001, to two additional Utah clients for $3,900 each. Veys told the clients the bear hunt would be based from the Pybus Point Lodge, and said Jairell would be their bear hunting guide. Between May 31, 2001 and June 7, 2001, Veys and Jairell conducted guided black bear hunts for the two clients. Veys provided lodge boats and boat captains for the guided hunts and provided lodge facilities and equipment for the hunt. Veys also provided facilities and equipment for processing the bears and trophy parts of bears and preparing bear hides and skulls for shipping to the client's homes. Jairell met with the two Utah residents at the Pybus Point Lodge and guided them on black bear hunts using Lodge facilities, a Lodge boat and the Lodge boat captain. On two separate hunts over a two-day period, Jairell directed the Lodge boat to Kake, acquired a vehicle, drove the hunters in areas he chose on Kupreanof Island looking for bears, advised the hunters whether or not to shoot a particular bear, skinned and deheaded the bears each hunter shot, transported the bear skins and skulls from the kill sites to Pybus Point Lodge, where he removed the skulls, fleshed the skulls and hides, salted the hides, advised the hunters about what information to write on temporary bear sealing certificates, filling in some parts of the certificates himself and later transported, or arranged the transport, of the bear skins and skulls for sealing and shipment from Alaska to Utah. No registered guide was involved in the hunts of these two Utah clients. The two Utah clients left their bear hides and skulls at the Pybus Point Lodge with an agreement that Veys and Jairell would get the bears sealed at the Alaska Department of Fish & Game (as required by law) and then ship the bear hides and skulls to the clients in Utah. On June 7, 2001, Jairell made and submitted, or caused to be made and submitted, to the State of Alaska, temporary black bear sealing certificates which falsely reported that the two bears killed by the Utah hunters were killed on non-guided hunts.

39.    In 2001, after the close of the bear hunting seasons, Veys paid Jairell a fee for the services Jairell provided to the hunting clients Jairell guided out of the Pybus Point Lodge that year.

40.    Veys did not file a Transporter Activity Report with the State of Alaska at any time for the year 2001.

41.    According to Alaska Statute 16.05.925, the following restitution values are placed on the wildlife that was taken personally by Veys and Jairell and/or guided by Veys and Jairell.

May 8, 2007                                9

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

05/08/2007 18:07 FAX  9072716904    US PROBATION                  ☑ 014/034

Presentence Report - Alan J. Veys                    **DRAFT**

| Date of Hunt | Number of Hunters | Number of Black Bears Killed | Resti- tution Value - Black Bear | Total Resti- tution Value Black Bears | Cost of Hunting and Fishing for Each Hunter | Total Cost of Hunting and Fishing for Group | Cost of Black Bear Hunt Only For Each Person | Total Cost of Black Bear Hunt Only for Group |
|---|---|---|---|---|---|---|---|---|
| June 3 & 4, 2000 | 3 | 2 | $600 | $1,200 | $3,695 | 11,085 | $1,500 | $4,500 (note only two bears killed) |
| Sept 4 - 6, 2001 | 1 | 1 | $600 | $600 | $4,000 (for wife's hunting & fishing) | $4,000 | $1,500 | $1,500 |
| June 5-8, 2001 | 2 | 2 | $600 | $1,200 | $4,000 for father $2,195 + for son's (estimated at $4,000) | $8,000 (estimated) | $1,805 for father ($4,000 - $2195 = $1805) $1,805 for son | $3,610 (estimated) |
| Sept 3 & 4, 2001 | 3 | 3 | $600 | $1,800 | $3,900 each | $11,700 | Unknown (estimated at $1,500) | Unknown (estimated at $4,500) |
| May 31 - June 7, 2001 | 2 | 2 | $600 | $1,200 | $3,900 each | $7,800 | Unknown (estimated at $1,500) | Unknown (estimated at $3,000) |
| Total | 11 | 10 | -- | $6,000 | -- | $42,585 | -- | $17,110 |

<u>Victim Impact Statement</u>

42.    There are no identifiable individual victims in the counts of conviction.

May 8, 2007                    10

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisciosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

**Exh. A, p. 10 of 30**

Presentence Report - Alan J. Veys                                           **DRAFT**

### Obstruction of Justice/Reckless Endangerment

43.  The probation officer has no information suggesting that the defendant impeded or obstructed justice, or that the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer.

### Acceptance of Responsibility

44.  The defendant entered pleas of guilty to Count 1 of the Information and admitted to facts sufficient to establish the essential elements of the offense of conviction.

### Offense Level Computation

45.  The guidelines amended November 1, 2006, will be in effect at the time of sentencing, and were used in the preparation of this report. Pursuant to the Supreme Court decision in *United States v. Booker*, the Sentencing Guidelines are advisory and non-binding.

46.  If the offense involved a conspiracy, attempt, or solicitation, refer to 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index of the substantive offense. U.S.S.G. § 1B1.2(a).

47.  **Base Offense Level:** The base offense level is the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. U.S.S.G. § 2X1.1 (a). The U.S. Sentencing Commission guideline for a violation of 16 U.S.C. § 3372(a)(2)(A), (d)(2), 3373(d)(1)(B), and (d)(3)(A)(ii), the substantive offense, is found in U.S.S.G. § 2Q2.1. The base offense level is 6.                                                                  **6**

48.  **Specific Offense Characteristic:** If the offense (A) was committed for pecuniary gain or otherwise involved a commercial purpose; or (B) involved a pattern of similar violations, increase by two levels. U.S.S.G. § 2Q2.1(b)(1). The offense involved the defendant participating in commercial hunting (without an Alaska Registered Guide license), for which the defendant was paid by customers. Therefore the base offense level is increased by two levels.                                                                   **2**

49.  **Specific Offense Characteristic:** If the market value of the fish, wildlife, or plants (I) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in § 2B1.1. U.S.S.G. § 2Q2.1(b)(3)(A). If the loss is between $10,000 and $30,000, increase the offense level four levels. U.S.S.G. § 2B1.1(b)(1)(C). In this offense, the market value of the wildlife illegally taken from June 3, 2000 to June 7, 2001, totaled $17,110, which represents what Veys and Jairell were paid for the black-bear hunts. Therefore the base offense level is increased by four levels.    **4**

50.  **Victim Related Adjustment:** None.                                            **0**

May 8, 2007                                     11

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

**Exh. A, p. 11 of 30**

05/08/2007 18.08 FAX  9072716904          US PROBATION                                   ☑016/034

Presentence Report - Alan J. Veys                                                    **DRAFT**

51.    **Adjustment for Role in the Offense**: None.                                    **0**

52.    **Adjustment for Obstruction of Justice/Reckless Endangerment**: None.          **0**

53.    **Adjusted Offense Level (Subtotal)**:                                           **12**

54.    **Career Offender**: Not applicable.                                            **0**

55.    **Criminal Livelihood**: Not applicable.                                        **0**

56.    **Armed Career Offender**: Not applicable.                                      **0**

57.    **Adjustment for Acceptance of Responsibility**:  If the defendant clearly demonstrates
       acceptance of responsibility for the offense, decrease the offense level by two levels.
       U.S.S.G. § 3E1.1(a).  In this case, the defendant entered a plea of guilty in a timely manner.
       Therefore, a two-level reduction is appropriate.                                **-2**

58.    **Total Offense Level**:                                                        **10**

       Offense Behavior Not Part of Relevant Conduct

59.    None known.

**PART B.    THE DEFENDANT'S CRIMINAL HISTORY**

       Juvenile Adjudications

60.    During his teen years, the defendant resided in the state of Washington. According to the
       National Law Enforcement Telecommunications System (NLETS) for the state of
       Washington, the defendant has no criminal history in the state of Washington.  The
       juvenile records for the State of Washington were not checked as the defendant was born
       in 1953, and it is unlikely that juvenile records dating back to 1971, when the defendant
       was eighteen years of age, are available.  Furthermore, pursuant to U.S.S.G. §§ 4A1.2(d)
       and (e) and the time of commencement of relevant conduct for the instant offense, any
       convictions from 1971 would not be countable.

       Criminal Convictions

61.    According to the National Law Enforcement Telecommunications System (NLETS), the
       defendant has no adult criminal history at the State level in Oregon, Nevada, Washington,
       Wyoming, California, Arizona, Idaho, Montana, Utah, Colorado, Texas, or New Mexico.
       According to the Alaska Public Safety Information Network (APSIN), the National Crime
       Information Center (NCIC), the Alaska Department of Public Safety (DPS), the Department
       of Fish and Wildlife (F & W), and the records of the Alaska Court System, the defendant has
       the following criminal history in Alaska.

May 8, 2007                                12

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request.  Further disclosure or redisclosure is authorized only to this extent necessary to comply with
applicable statutes and established case law.

Presentence Report - Alan J. Veys                                        **DRAFT**

| | DATE OF ARREST/ SUMMONS | CONVICTION/ COURT | DATE SENTENCE IMPOSED/DISPOSITION | GUIDELINE | POINTS |
|---|---|---|---|---|---|
| 62. | 07/22/96 (age 42) | Sale Sportcaught Fish (misdemeanor, 5AAC75.015)/ District Court, Petersburg, Alaska 1PE-96-00214 CR | 10/28/96: Guilty, Suspended Imposition of Sentence (SIS), one year probation 12/04/97: Order of Discharge after SIS | U.S.S.G. §§ 4A1.2(a)(2) and 4A1.2, comment (n.3) | 0 see next |

The aforementioned and following information is according to the records of the Alaska Court System, Petersburg, and the records of the State of Alaska DPS and F & W. The defendant was represented by counsel.

The following information is according to DPS case number 960031519.

On July 22, 1996, the Department of F & W, Juneau, received a complaint that Allen J. Veys was allowing clients at Pybus Point Lodge to catch under-size salmon. Also, salmon that was sport caught was being used to feed clients at Pybus Point Lodge.

DPS troopers responded to Pybus Point Lodge and interviewed Veys. Interviews were conducted of Veys and two of his employees, who were sport fish guides for Pybus Point Lodge. Veys admitted to serving sport-caught salmon and halibut to clients of Pybus Point Lodge. DPS troopers also found that Veys was conducting a sport-fish charter guide business without a 1996 Sport Fish Guiding registration through Alaska Department of Fish and Game. Summons and Complaint # W599331 was issued to Veys for Sale of Sport Caught Fish and Summons and Complaint # W599337 was issued to Veys for No Sport Fish Guide Registration (see conviction below). The defendant was instructed to appear in court in each case on August 20, 1996, at 10:30 a.m.

Summons and Complaint # W599331 reflects that during May, June and through Mid July 1996, the defendant sport fished halibut and salmon and furnished the halibut and salmon to paying clients as meals at the lodge, Pybus Point Lodge, which he owned and operated.

Summons and Complaint # W599337 reflects that the defendant provided guided salt-water sport fishing trips for paying clients in the 1996 registration year without registering with the Alaska Department of Fish and Game as a Sport Fishing Guide.

May 8, 2007                            13

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report – Alan J. Veys                                            **DRAFT**

| 63. | 07/22/96 (age 42) | No Sport Fish Guide Registration (misdemeanor, 5AAC75.075)/ District Court, Petersburg, Alaska 1PE-96-00215 CR | 10/28/96: Guilty, SIS, one year probation. 12/04/97: Order of Discharge after SIS | U.S.S.G. §§ 4A1.1(c) and 4A1.2(c)(1) | 1 |

The aforementioned and following information is according to the records of the Alaska Court System, Petersburg, and the records of the Alaska DPS and F & W. The defendant was represented by counsel.

See above conviction for description of offense from DPS case number 960031519.

| 64. | 07/25/98 (age 44) | SP Miscellaneous [violation 5AAC 75.010(m)]/ District Court, Petersburg, Alaska 1PE-98-49608 CR | 08/03/98: $100 fine. | U.S.S.G. § 4A1.2(c)(1) | 0 |

The aforementioned and following information is according to the records of the Alaska Court System, Petersburg, and the records of the State of Alaska DPS and Department of F & W. There is no indication that the defendant was represented by counsel.

"Summons # W612126" was issued to Veys for Failure to have Biodegradeable Escape Panel on Sport Shrimp Pots. The defendant was instructed to appear in court on August 4, 1998, at 10:30 a.m.

According to the officer's notes, the defendant was the owner of the gear, but was letting a client from his lodge at Pypus Point, fish the pots. Veys wanted to take responsibility for the violation since the client was depending on his knowledge of regulations. The officer noted that "attitude good, four pots returned to owner."

| 65. | 09/14/00 (age 46) | Unsld Bear [violation 5AAC 92.165(a)(1)]/ District Court, Juneau, Alaska 1JU-00-64386 | 09/19/00: Guilty, $100 fine. | U.S.S.G. § 4A1.2(c)(1) | 0 |

The aforementioned and following information is according to the records of the State of Alaska DPS and Department of F & W. There is no indication that the defendant was represented by counsel.

On September 14, 2000, the defendant was issued citation number W643326

May 8, 2007                                  14

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Exh. A, p. 14 of 30

Presentence Report - Alan J. Veys                                                    **DRAFT**

for "Removing a Bear Taken in GMU 12 Prior to Having it Sealed."

| | | | | | |
|---|---|---|---|---|---|
| 66. | 07/17/01<br>(age 47) | Cts. 1-4, PE UG FL<br>MK GR/Buoy<br>(violation 5AAC<br>77.010)/<br>District Court,<br>Petersburg, Alaska<br>1PE-01-54208 | 07/18/01: Guilty Cts 1- 4,<br>$100 fine each. | U.S.S.G. §<br>4A1.2(c)(1) | 0 |

The aforementioned and following information is according to the records of
the State of Alaska DPS and Department of F & W. On July 17, 2001, the
defendant was issued citations W0633318, W0633317, W0633316, and
W0633312. There is no indication that the defendant was represented by
counsel.

| | | | | | |
|---|---|---|---|---|---|
| 67. | 08/20/02<br>(age 48) | No Bio Panel<br>[violation 5AAC<br>75.035(1)]/<br>District Court,<br>Petersburg, Alaska<br>1PE-02-58687<br>(non-criminal) | 09/05/02: Guilty, $100<br>fine. | U.S.S.G. §<br>4A1.2(c)(1) | 0 |

The aforementioned and following information is according to the records of
State of Alaska DPS and Department of F & W. There is no indication that
the defendant was represented by counsel.

On August 20, 2002, officers inspected a sport shrimp pot in Pybus Bay. The
shrimp gear contained two shrimp pots that were freshly baited and contained
a small amount of shrimp. The shrimp pot was marked with three buoys, one
large ball buoy that did not have any markings, a small trailer cork with no
markings, and a Dungeness-style cork with only the faded markings of
"....Juneau, AK...790-4866..." The phone number on the faded cork matched
the phone number on a previously checked buoy that belonged to Alan Veys.
Later the same day, officers contacted Veys at the Pybus Point Lodge. Veys
stated that he had two pots that he knew of in the water and was having
difficulty keeping his markings on the buoys. Veys stated that if the buoy
bore his phone number than it was probably his. Officers then suggested to
Veys that he would have better luck using buoy paint rather than a magic
marker to mark his buoys. Veys agreed and said he would look into marking
his gear with buoy paint. Veys was issued citation number W646312.

May 8, 2007                                   15

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or rediscloure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

Presentence Report - Alan J. Veys                                          **DRAFT**

| 68. | 08/13/03 (age 49) | Reg & Numbering of Boat [AS05.25.055(D)]/ District Court, Petersburg, Alaska case # listed as 1PE-00-0645129 (but perhaps it is 1PE-*03*-0645129) | 09/05/02: Guilty, $50 fine. | U.S.S.G. § 4A1.2(c)(1) | 0 |

The aforementioned information is according to the computerized records of the Petersburg Court System. There is no indication that the defendant was represented by counsel. The following information is according to the records of Alaska DPS.

On August 13, 2003, under case number 030063754, Ketchikan Fish and Wildlife Protection Enforcement (KEFE) issued citation number W645129 to Veys for Operating a Vessel Without Displaying "Alaska #'s."

Criminal History Computation

69.   The criminal convictions above result in one criminal history point and a **criminal history category of I.** U.S.S.G. Ch. 5, Pt. A.

Other Criminal Conduct

70.   According to the records of the Alaska DPS, on May 7, 1992 (age 38), at 9:36 p.m. Jimmie Rosenbruch reported that the defendant assaulted himself and two of his clients at Cannery Cove on the South end of Admiralty Island by speeding across the bow of his skiff and firing 20 to 25 rounds from a semi-auto or full-automatic weapon. Rosenbruch indicated that Veys was one to two hundred yards from Rosenbruch's skiff when Veys fired the weapon. Rosenbruch stated that he and his clients felt threatened by Veys' actions. Rosenbruch reported that when he confronted Veys the man became verbally abusive. Rosenbruch said the assault took place at 6:15 p.m. on May 7, 1992. Veys was interviewed by telephone on May 9, 1992. Veys reported that on the day and time in question he and two of his guests were in Cannery Cove with the intention of pulling his crab pots. Veys said he had a bunch of seal bombs and he and his guest were throwing them over board and watching them explode. They had thrown several of them when a skiff came up to them and the people in the skiff were yelling and swearing at them. Veys said he did not have a firearm on the boat and the only people that had guns were the hunters on the skiff. Both Rosbruch and Veys were instructed to send written statements to Juneau Alaska State Troopers, which they did. Rosenbruch also had his clients write statements which, according to DPS records, are part of the report. Veys indicated his guest did not want to be involved. According to DPS, the case number for the offense is 1JU-92-30682 CR. Records were requested from the Clerk of the Court Juneau on March 21, 2007, and have not yet been received.

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

**Exh. A, p. 16 of 30**

05/08/2007 18:10 FAX 9072716904                 US PROBATION                                      ⌀021/034

Presentence Report - Alan J. Veys                                                    **DRAFT**

    Pending Charges

71.   None known.

    Other Arrests

72.   According to the Offender Tracking Information System (OTIS), the defendant was charged in the Superior Court of Alaska, Juneau, under case number 1JU-S90-1247CI, with Failure to Appear. The disposition of the case is unknown. On March 21, 2007, records were requested from the Clerk of Court Juneau, but have not yet been received.

    Fish and Wildlife Warnings

73.   According to the records of Alaska DPS, on June 9, 1992 (age 38), under case number 920039826, Craig Fish and Wildlife Protection Enforcement (CRFE) gave a written warning to Veys for Crab Pots Fishing Without a Biodegradable Panel.

74.   According to the records of Alaska DPS, on May 16, 2001 (age 47), under case number 010025899, Petersburg Fish and Wildlife Protection Enforcement (PEFE) gave a violation warning to Veys for not properly marking his personal use crab gear.

## PART C. DEFENDANT CHARACTERISTICS

    Personal and Family Data

75.   The following information is according to the pretrial report prepared in relation to the instant offense, a presentence interview conducted in relation to the instant offense in the presence of the defendant's counsel, the records of the Social Security Administration (SSA), and other sources as noted. The information contained under Part C. Defendant Characteristics was verified through the sources as noted. The presentence author had no contact numbers for anyone not associated with the instant offense.

76.   According to the records of SSA, Alan Jules Veys was born on September 18, 1953 (age 53), in Longview, Washington, to the union of Andre (Andy) M. Veys and Emma E. Coupe´. The defendant reported having one brother, Jeff Veys (age 51) who resides in Longview, Washington, where he is a self-employed manager of rental property and has tree farms. Veys indicated that following his parents divorce, which occurred when he was six years old, he lived with his mother, but enjoyed regular contact with his father throughout his youth. The defendant reported having been provided with adequate food, clothing, and shelter as a child and having suffered no physical, sexual, or emotional abuse as a child. Veys stated that his mother passed away in approximately 1983 and his father passed away in 1993 or 1994. The defendant indicated he resided in Longview until 1984, when he moved to Petersburg, Alaska, where he lived for approximately 18 months before building his lodge on Admiralty Island, Alaska, in 1985. Veys stated that since 1985 he has split his time between Admiralty Island and a one bedroom apartment above his metal shop located in Castle Rock, Washington. The defendant further indicated he spends three to four months on the road each year traveling to approximately 11 sports shows selling fishing and hunting

May 8, 2007                                     17

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

trips.

77.   In approximately 1975, in Longview, Washington, Veys married Patricia Olsen. Two
      children were born of this marriage, although one child passed away at two months of age
      from spinal meningitis. The surviving child, Kristine Veys (age 26) is a college graduate and
      resides in Vancouver, Washington, where she may be employed in the field of forensics. The
      defendant reported that his daughter is healthy. Veys and Olsen divorced in approximately
      1982, when Kristine was approximately two years old.

78.   In 1991, the defendant married a woman named Janice (whose maiden name he could not
      recall). The marriage took place at the defendant's lodge on Admiralty Island and ended in
      divorce approximately three years later in 1994. No children were born of this marriage.

79.   APSIN lists the defendants mailing address as P.O. Box 33497, Juneau, Alaska, with a
      physical address of Cannery Cove, Admiralty Island, Juneau. Due to the defendant's remote
      living location, neither the pretrial services officer nor the presentence author conducted a
      field visit to the defendant's home. At the time of the presentence interview, the defendant
      was uncertain as to his plans for the future.

      Physical Condition

80.   At age 53, the defendant stands six feet tall, weighs 225 pounds, and has brown hair and blue
      eyes. The defendant reported and APSIN reflects no scars or tattoos.

81.   Initially Veys reported suffering from no chronic illnesses, but then indicated he had been
      diagnosed with high blood pressure approximately 18 months ago. The defendant was
      uncertain of the name of his high blood pressure medication.

82.   Veys stated he has no known allergies to any foods or medications.

      Mental and Emotional Health

83.   The defendant reported that while in school he was in reading classes. However, Veys stated
      he does not believe he is dyslexic.

84.   The defendant reported that he has become very depressed in relation to the events associated
      with the instant offense. Following the advise of his attorney, Veys underwent a
      psychological evaluation and began counseling with David J. Sperbeck, Ph.D., of Anchorage,
      in June 2006. The defendant indicated he receives counseling via telephone from Dr.
      Sperbeck two to three times each week. Veys stated he is not taking any medication for
      depression. Veys' counsel stated Veys is very visual and artistic, but has difficulty reading.
      According to defense counsel, intelligence quotient testing was not included in Dr.
      Sperbeck's evaluation. Defense counsel indicated the report of the psychological testing of
      his client had not been filed with the Court, however, the Court has been advised that defense
      counsel will be presenting a diminished capacity argument.

85.   On February 16, 2007, a psychological report of the defendant was filed with the Court by

May 8, 2007                              18

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

Exh. A, p. 18 of 30

Presentence Report - Alan J. Veys                                                    **DRAFT**

the government. The report was not sealed. During the presentence report, Veys did not sign a release of information for psychological records. Defense counsel has indicated they plan to attach the report to their sentencing memorandum but will request that the Court seal the report filed by the government on February 16, 2007, as well as the attachment of the report to defense counsel's sentencing memorandum.

<u>Substance Abuse</u>

86.    The defendant reported that at most he consumes a "few" beers in a weeks time. Veys denied any use of any illicit drugs or abuse of any prescription drugs. The defendant indicated he has never undergone any form of substance abuse treatment and has never been referred to such.

<u>Education and Vocational Skills</u>

87.    The defendant reported he graduated from Kelso High School of Kelso, Washington in 1972. The probation officer is awaiting the receipt of Veys high school records from Kelso High School. College transcripts received from Lower Columbia College reflect that the defendant graduated from Kelso High School of Washington in 1972 with a grade-point average of 2.22 and a class rank of 218 out of 367 students.

88.    The defendant indicated he earned approximately 90 credit hours at Lower Columbia College (a two-year college per their website) of Longview, Washington, having last attended classes there in approximately 1975. Veys reported he studied forestry while in college. Transcripts provided by Lower Columbia College reflect that between the Fall of 1972 and the Winter of 1976, the defendant completed 85 credit hours and had a cumulative grade-point average of 2.39. The transcripts appear to reflect a combination of general-study courses and forestry-related courses.

89.    The defendant reported having experience and proficiency in the following trades: plumbing, electrical, welding, master carpentry (furniture), and water and waste systems. Veys further reported he performs the maintenance on his five 30-foot boats, built his lodge, Pybus Point Lodge( and its five or six guest houses), and maintains a commercial pilot license (originally obtained in 1987) with land and sea and rotorcraft certification and is also a certified flight instructor.

90.    The defendant reported having obtained a general contractors license in Washington some time ago, but indicated the license was last current sometime in the early 80's.

91.    Veys stated he maintains business licenses under the names Loan Eagle Resorts, Corp. and Alan J. Veys Properties, LLC.

92.    The defendant indicated that in relation to the instant offense he has agreed to turn in his transporter license with the State of Alaska.

May 8, 2007                                    19

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                              **DRAFT**

Employment

93.   Veys reported that during high school and college he was employed by grocery stores and
      gas stations. The defendant indicated that since having left college in approximately 1975,
      he has been self-employed. Veys stated he filed taxes annually.

94.   Veys' earnings records on file with SSA, date back to 1970, when the defendant was 17 years
      old. The defendant had reported earnings for each of the years 1970 through 1974 and 1976,
      however, SSA's computerized records have no detailed information regarding Veys'
      employers during this time period. The following information is according to the earnings
      records of the SSA.

95.   In 1970, the defendant earned an annual income of $559.

96.   In 1971, the defendant earned a yearly income of $939.

97.   In 1972, the defendant earned an annual income of $3,541.

98.   In 1973, the defendant earned a yearly income of $3,848.

99.   In 1974, the defendant earned an annual income of $876.

100.  The records of SSA reflect no earnings for the defendant for the year 1975.

101.  In 1976, the defendant earned an yearly income of $450.

102.  The records of SSA reflect no earnings for the defendant for the year 1977.

103.  The records of SSA reflect no earnings for the defendant for the year 1978.

104.  The records of SSA reflect no earnings for the defendant for the year 1979.

105.  The records of SSA reflect no earnings for the defendant for the year 1980.

106.  The records of SSA reflect no earnings for the defendant for the year 1981.

107.  The records of SSA reflect no earnings for the defendant for the year 1982.

108.  In 1983, the defendant reported self-employment income of $35,700 for the year.

109.  The records of SSA reflect no earnings for the defendant for the year 1984.

110.  The records of SSA reflect no earnings for the defendant for the year 1985.

111.  In 1986, the defendant was employed by Long Air Inc, where he earned an annual income
      of $2,313.

May 8, 2007                              20

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

112.    In 1987, the defendant was employed by Long Air Inc, where he earned a yearly income of $369.

113.    No further earning information was listed in the records supplied by SSA.

114.    The defendant reported previous employment as a helicopter pilot for life-flight rescues and for Drug Enforcement Administration investigations.

115.    Veys described his usual occupation as a fishing guide and as the owner and operator of Pybus Point Lodge.

Financial Condition:  Ability to Pay

116.    According to the records of the Alaska Court System under case number 3AN-05-14256 CI, a Writ of Execution dated March 14, 2006, reflects that on December 20, 2005, in the Superior Court for the State of Alaska at Anchorage, Marvin N. Applequist, Val B. Jones, Bruce F. Reed and Pybus Alaska Resorts LLC, a Wyoming limited liability company, recovered a judgment against Alan J. Veys, individually and d/b/a Lone Eagle Resorts, Inc., an Alaska corporation, and Pybus Point Lodge, LLC, a Washington limited liability company, and Alan J. Veys Properties, LLC, a Washington limited liability company in the total amount of $3,000,000.00.[9]  The Writ of Execution dated March 14, 2006, reflects accrued interest in the amount of $69,041.10 for a total of $3,069,041.10.[10]  On April 20, 2006, an order was entered granting the consolidation of case numbers 3AN-05-14256 CI and 3AN-06-06847 CI.  According to the computerized records of the Alaska Court System, case number 3AN-06-06847 CI (Foreign judgment) is captioned: Marvin N. Applequist, Val B. Jones, Pybus Alaska Resorts, and Bruce F. Reed v. Alan J. Veys Property and Alan J. Veys. No further information was received regarding case number 3AN-06-06847 CI.  (It appears that the aforementioned are foreign judgments related to the following case which was adjudicated in Wyoming.)

117.    According to the records of the Converse County, Wyoming Court System under Civil Action Number 14186, on April 6, 2006, a judgment for attorneys' fees and costs was entered in favor of the Plaintiffs, Marvin N. Applequist, et al and against the defendants, Alan J. Veys, et. al., in the amount of $110,307.73, with interest at the rate of ten percent per annum from the date of judgment.  On April 12, 2006, the aforementioned judgment was filed with the Superior Court for the State of Alaska.

118.    According to the computerized records of the Alaska Court System, Alan J. Veys has also been named in the following civil litigations in Juneau, Alaska.  On March 21, 2007, the following records were requested from the Clerk of Court Juneau, but have not yet been

_____

[9] According to defense counsel, the defendant filed an appeal in this case, but the judgment was affirmed.

[10] In his bankruptcy filing of July 2006, the defendant lists that the total judgment entered against him in December 2005 was $3,700,000.  Veys also lists funds in the amount of $798,000 as being held by the Superior Court for the State of Alaska, Anchorage, and the unsecured portion of the claim as being $825,000.

May 8, 2007                          21

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                                      **DRAFT**

received.

       1JU-00-00920 CI (Civil), Battley et al v. Alan J. Veys and Pybus Point Lodge

       1JU-95-01247 CI (Civil), Cooper et al v. Alan J. Veys and Pybus Point Lodge

       1JU-94-01784 DR (Divorce), Janice Veys v. Alan J. Veys.

119.    According to the Statewide Recorder's Office file, the defendant was ordered to pay $37,310.95, in civil case 1JU-95-01247, to plaintiffs David A. Cooper and Nan E. Cooper.

120.    According to the records of the Alaska Permanent Fund Dividend Division, the defendant has filed for dividends from 1991 to 1995, and from 1997 to 2004, filing in 2004 from P.O. Box 33497, Juneau, with Valerie J. Svendsen.

121.    According to the Alaska Division of Motor Vehicles (DMV), the defendant holds title to the following vehicles: a 1995 Ford pickup, license 5464 DC; a 2002 Ford F350 pickup, license EBU 732; a 1999 Chevrolet, license DZC 853; a 1970 Plymouth Baracuda, license MYCUDA; and a 1971 Plymouth Baracuda, license 71CUDA.

122.    According to a signed financial affidavit completed during the presentence interview conducted in relation to the instant offense, Veys declared the following assets and liabilities. Additional information was obtained from the records of the U.S. Bankruptcy Court for the Western District of Washington. According to such records, the defendant filed for Chapter 11 Bankruptcy on May 1, 2006, under case number 06-40911; and on July 19, 2006, under case numbers 06-12338 and 06-41887.

123.    The defendant reported he maintains a checking and savings account with Wells Fargo which have balances of approximately $30,000 and $5,500 respectively. (At the time of the defendant's bankruptcy petition of July 19, 2006, the defendant reported having $900,000 cash on hand. Veys also reported in the July bankruptcy petition that on March 21, 2006, $798,000 had been seized from his Wells Fargo account - presumably in relation to the aforementioned multi-million dollar judgment against the defendant.) Veys stated he has no certificates of deposit, no 401K or similar type accounts, and no individual retirement accounts. However, the defendant reported ownership of mutual funds through Wachovia, which he estimated to have a fair market value of $1.8 million. (In his bankruptcy petition of July 2006, Veys valued his Wachovia account at $725,000.)

124.    The defendant reported his neighbor, Mike Shaw, owes him $12,000.[11] Veys indicated they have not been getting along well lately, but he hopes to correct this situation. The defendant further stated there are many others who owe him smaller amounts of money. Veys' counsel reported the defendant has been quite generous to others. (In his bankruptcy petition of July 2006, Veys listed the aforementioned debt as being owed to him as well as the following: Roger Stowell - $15,000 and Lone Eagle Resorts, Inc., the defendant's business, $384,279.)

---

[11] It is noted that this writer, whose last name is also Shaw, does not know and is not related to Mike Shaw.

May 8, 2007              22

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

125.    Veys stated he has no life insurance and no safe deposit boxes or storage space facilities.

126.    The defendant reported ownership of four of the five vehicles listed by DMV (see above) as belonging to Veys. The defendant estimated the value of the vehicles as follows: 1999 Chevrolet - $6,000, 2002 Ford F350 pickup - $25,000 (per credit report appears to have been paid in full in 2004), 1970 Plymouth Baracuda - $17,000, and 1971 Plymouth Baracuda - $28,000. Veys indicated the 1995 Ford pickup was sold some time ago. (The above-noted values are similar to those as reflected in the defendant's July 2006 bankruptcy filing.) According to his bankruptcy petition of July 2006, in May 2006 a Cessna U206 float plane with a value of $125,000, was seized from Craig Loken. It appears the defendant had given Loken the plane in exchange for 12 months of air charter services for the defendant's business Lone Eagle Resorts. During a portion of the presentence interview inquiring about the defendant's skills, the defendant mentioned maintaining five 30-foot boats. However, during questioning regarding his assets, he did not mention, nor did his bankruptcy petition, list ownership of any boats. According to a DPS report dated September 14, 2006, the defendant alleged that his neighbor and lodge caretaker, Mike Shaw, had sank Veys' $70,000 boat on or about September 12, 2006.[12] The current status of the boat is unknown.

127.    Veys reported ownership of the following real estate.

Three duplexes located at 71, 73, and 75 Veys Drive in Kelso, Washington, each of which he estimated were worth $100,000 to $110,000 each. (In his bankruptcy petition of July 2006, Veys reported the total value of these three duplexes as $450,000.)

A duplex located at 124 Tilla Drive in Kelso, Washington, also estimated by Veys to be valued at $100,000 to $110,000. (In his bankruptcy petition of July 2006, Veys reported the value of this duplex as $150,000.)

Twenty acres of land in Longview, Washington, which he estimated is worth $150,000 to $200,000. (In his bankruptcy petition of July 2006, Veys reported the value of this land to be $350,000.)

Seventy-five acres of timber in Castle Rock, Washington, the value of which he reported he was uncertain. (In his bankruptcy petition of July 2006, Veys reported the value of this land to be $1,350,000.)

A metal shop with an attached apartment on seven to eight acres of land in Castle Rock, Washington, estimated by Veys to be valued at $200,000. (In his bankruptcy petition of July

---

[12] DPS found that the scupper plugs had been removed from the sides of the boat. On September 14, 2006, Shaw's wife indicated that Shaw had been in Healy guiding since August 29, 2006. DPS questioned Veys about having removed the brass plug. Initially Veys stated he did not touch the plug, but then corrected himself and stated that he did remove it to let the water out of the boat when it was on the beach after it had sunk. Veys stated the bilge pumps were working fine on the boat, but he did not know if the switch was in the automatic setting. When DPS asked Veys if he was in the process of losing his boat in the criminal and civil cases, Veys stated DPS should not be asking him that question and that if he wanted to damage the boat he would do more damage to the boat then there had been done already. Veys stated he would not lower himself to that kind of "silliness."

May 8, 2007                                    23

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                              **DRAFT**

2006, Veys reported the value of this property to be $160,000.)

Four to five acres of land in Castle Acres, Washington. Veys reported paying $2,500 for the land in the late '90's, but stated he is uncertain of its current value. (This property is not reflected in Veys bankruptcy petition of July 2006).

Half acre lot in Petersburg, Alaska, which Veys valued at approximately $22,000. (In his bankruptcy petition of July 2006, Veys reported the value of this property to be $25,000.)

Pybus Point Lodge on Admiralty Island, Alaska, which Veys valued at approximately $3.8 million. (Appears to be listed as an asset of the defendant's business Lone Eagle Resorts, Inc. in his bankruptcy filing of July 2006, and Veys' interest in the property is listed as $3,500,000.)

128.    Other than his two Plymouth Baracuda vehicles (see above), the defendant reported having no other collectibles. (In his July 2006 bankruptcy petition, the defendant reported ownership of a silver coin collection with an unknown value and rifles, shotgun and three or four pistols with a total value of $8,000.) (Also in his July 2006 bankruptcy petition, the defendant reported ownership of a Commercial Long Line halibut fishing permit issued by the State of Aalska valued at $6,000 and tools valued at $3,000.) Veys reported no expectation of receipt of any significant assets and indicated he is not the beneficiary of a trust.

129.    In his bankruptcy petition of July 2006, Veys reported ownership or interest in the following business.

| Name | Address | Nature of Business | Beginning and End Dates | Value as of July 2006 |
|---|---|---|---|---|
| Lone Eagle Resorts, Inc. | POB 33497 Juneau, Alaska | Fishing Lodge | 08/20/98 - present | $3,500,000 (appears this may be combined value of Lone Eagle Resorts, Inc. and Alan J. Veys Properties, LLC) |
| Alan J. Veys Properties, LLC | 1555 3rd Ave #D Longview, WA | Holds real estate | 01/04/02 - present | (see above) |
| Pybus Point Lodge, LLC | POB 33497 Juneau, Alaska | None | 01/04/02 - present | none reflected |
| Columbia Realty Services, Inc. | 1555 3rd Ave #D Longview, WA | Owns real estate | 09/21/91 - administratively dissolved | $5,000 |

130.    Veys reported he is not expecting a tax return for tax year 2006.

May 8, 2007                                24

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

05/08/2007 18:13 FAX  9072716904          US PROBATION                                      ☑ 029/034

Presentence Report - Alan J. Veys                                        **DRAFT**

131.  The defendant reported debt in the amount of $3.4 million as a result of the aforementioned
      judgment against the defendant and his business holdings. Veys further indicated that in July
      2006, he filed Chapter 11 bankruptcy petitions in Washington which remain pending.
      According to the bankruptcy records of the Western District of Washington, on May 1, 2006,
      under case number 06-40911, the defendant filed Chapter 11 bankruptcy. Also according
      to the bankruptcy records of the Western District of Washington, on July 19, 2006, under
      case numbers 06-12338 and 06-41887, the defendant filed for Chapter 11 bankruptcy.

132.  According to Schedule I of the defendant's bankruptcy petition of July 2006, the defendant
      reported total net monthly take home pay of $5,950, income from real property of $490, and
      income from interest and dividends of $400, for a total monthly income of $6,840. The
      defendant reported monthly medical expenses of $2,500 and monthly transportation expenses
      of $2,500, homeowner's insurance of $350 and auto insurance of $200, for total monthly
      expenses of $5,610 and a net monthly income of $1,230.

133.  A table entitled Summary of Schedules in the defendant's bankruptcy petition of July 2006
      reflects the following.

| Name of Schedule | Assets | Liabilities |
|---|---|---|
| A - Real Property | $2,485,000.00 | |
| B - Personal Property | $6,391,949.00 | |
| D - Creditors Holding Secured Claims | | $3,700,000.00 |
| E - Creditors Holding Unsecured Priority Claims | | $0.00 |
| F - Creditors Holding Unsecured Nonpriority Claims | | $66,598.00 |
| Total | $8,876,949.00 | $3,766.598.00 |

134.  A document entitled Statement of Financial Affairs in the defendant's bankruptcy petition
      of July 2006 reflects the following income from employment or operation of business.

| Year | Amount | Source |
|---|---|---|
| 2006 | $31,792.50 | $7,000 - Employment year-to-date<br>$24,792.50 - Gross rental income year-to-date |
| 2005 | $171,150 | Gross rental income and distribution |
| 2006 | $186,722 | Gross rental income and distribution |

May 8, 2007                                 25

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

05/08/2007 18:13 FAX  9072716904    US PROBATION        ☑ 030/034

Presentence Report - Alan J. Veys                    **DRAFT**

135. A document entitled Statement of Financial Affairs in the defendant's bankruptcy petition of July 2006 reflects the following additional income other than from employment or operation of business.

| Year | Amount | Source |
|------|--------|--------|
| 2005 | $66,918 | Interest, dividends, and capital gains |
| 2004 | $55,608 | Interest, dividends, and capital gains |

136. During the presentence interview, the defendant reported he did not believe he had made any draws from his businesses between 2004 and 2006. Veys reported the corporation paid him rent payments which he reinvested in the business. The defendant was unable to indicate his monthly or annual income for the present or past. However, Veys reported that during the hunting and fishing season he used to have 20 guests per week and he now he averages only 12 guests per week.

137. According to the "Profile Summary" of a credit report dated April 30, 2007, Veys has two public records, revolving credit balances totaling $2,956 and no past due amounts. The public records are both listed as having been filed on July 19, 2006, as Chapter 11 Bankruptcy Petitions in U.S. Bankruptcy Court in Seattle and Tacoma, Washington. The credit report reflects a balance as of April 14, 2007 of $2,956 with Bank of America with a minimum monthly payment of $29.

Financial Analysis

138. Although the defendant has a substantial civil judgment against him and may be ordered to pay restitution in the instant offense, he maintains substantial assets. Therefore it assessed that the defendant has the ability to pay a fine, if imposed.

**PART D. SENTENCING OPTIONS**

Custody

139. **Statutory Provisions:** The maximum term of imprisonment for the lesser-inlcuded misdemeanor violation of 18 U.S.C. § 371 is one year, making the offense a Class A misdemeanor under 18 U.S.C. §3559 (a)(6)

140. **Guideline Provisions:** Based on a total offense level of 10 and a criminal history category of I, **the guideline imprisonment range is six to 12 months.** U.S.S.G. Ch. 5, Pt. A.

141. Under U.S.S.G. § 5C1.1(c), if the minimum term of imprisonment in the applicable guideline range in the sentencing table is at least one but not more than six months, the **minimum** term may be satisfied by:

    a.    A sentence of imprisonment; or

May 8, 2007              26

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                          **DRAFT**

    b.     A sentence of <u>imprisonment</u> that includes a term of supervised release with a
                condition that substitutes community confinement or home detention according to the
                schedule in U.S.S.G. § 5C1.1(e), provided that at least one month is satisfied by
                imprisonment; or

    c.     A sentence of <u>probation</u> that includes a condition or combination of conditions that
                substitute intermittent confinement, community confinement, or home detention for
                imprisonment according to the schedule in U.S.S.G. § 5C1.1(e).

The defendant will be required to contribute 25% of gross wages toward subsistence while
residing in the community correctional center.

<u>Supervised Release</u>

142.    **Statutory Provisions**: If a term of imprisonment is imposed, the Court may impose a term
        of supervised release of not more than one year, as the count of conviction is a Class A
        misdemeanor.  18 U.S.C. § 3583(b)(3).  Title 18 U.S.C. § 3583(d) requires mandatory
        conditions of supervised release prohibiting the defendant from committing any federal,
        state, or local crime, prohibiting the defendant from possessing illegal controlled substances,
        prohibiting the defendant from any unlawful use of a controlled substance, and requiring the
        defendant to submit to a drug test within 15 days of the commencement of the term of
        supervised release and at least two periodic drug tests thereafter for use of a controlled
        substance.  This requirement may be ameliorated or suspended by the Court if reliable
        information indicates a low risk of future substance abuse by the defendant.  Supervised
        release must be revoked if the defendant is found by the Court to be in possession of a
        controlled substance. The Court should also impose the standard conditions of supervision
        as discussed in the next paragraph.

143.    **Guideline Provisions**: If a term of imprisonment of more than one year is imposed, the
        guidelines require a term of supervised release. U.S.S.G. § 5D1.1. The term of supervised
        release is one year for a Class A misdemeanor. U.S.S.G. § 5D1.2(a)(3). The recommended
        conditions of supervised release are those applicable for probation, excluding intermittent
        confinement. U.S.S.G. § 5D1.3. The thirteen standard conditions of supervision that are
        recommended are in addition to the mandatory conditions required by statute, and restrict the
        defendant's travel and associates, require employment, require support of dependents, and
        impose numerous reporting requirements. U.S.S.G. § 5D1.3. Twelve special conditions of
        supervision may also be ordered by the Court, as required by law or as appropriate in a
        particular case.  These include conditions relating to possession of weapons, restitution,
        fines, debt obligations, access to financial information, community confinement, home
        detention (as substituted for imprisonment), community service, occupational restrictions,
        substance abuse/mental health program participation, curfew (which limits the defendant to
        his or her place of residence during evening and nighttime hours), and search/seizure.

<u>Probation</u>

144.    **Statutory Provisions**: For a misdemeanor, the authorized term of probation is not more than
        five years.  18 U.S.C. § 3561(c)(2).  Title 18 U.S.C. § 3563(a)(1) requires mandatory

May 8, 2007                                         27

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.

05/08/2007 18:14 FAX  9072716904        US PROBATION                               ☒032/034

Presentence Report - Alan J. Veys                                    **DRAFT**

conditions of probation prohibiting the defendant from committing any federal, state, or local crime, and from possessing illegal controlled substances. Title 18 U.S.C. § 3563(b) permits the Court to impose a wide range of 'standard' and 'special' conditions of supervision, including intermittent confinement and a requirement that the defendant submit a DNA sample as directed by the probation officer.

145.   **Guideline Provisions**: Since the minimum term of imprisonment is at least one but not more than six months, the defendant is eligible for probation, provided that the Court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention for imprisonment as provided in U.S.S.G. § 5C1.1(c)(3), thereby satisfying the minimum of the guideline imprisonment range. U.S.S.G. § 5B1.1(a)(2). The term of probation for a level 10 offense is at least one but not more than five years. U.S.S.G. § 5B1.2(a)(1). Conditions of probation are listed at U.S.S.G. § 5B1.3 and include mandatory conditions required by statute; standard conditions which include restrictions on the defendant's travel and associates, requirements of employment and support of dependents, and numerous reporting instructions; and recommended special conditions which include weapons possession, debt obligation, substance abuse or mental health treatment, community or intermittent confinement, community service, and occupational restrictions. Additional conditions not listed by the Sentencing Commission but fashioned by the Court to address specific issues in a given case may also be imposed.

Fines

146.   **Statutory Provisions**: The maximum fine for a Class A misdemeanor conviction is $100,000. 18 U.S.C. § 3571(b)(5).

147.   Since the count of conviction was committed after December 11, 1987, the Criminal Fine Improvement Act is applicable, providing for no interest on fines of $2,500 or less. Interest on fines over $2,500 accrues beginning 15 days after the date of judgment and is based on the average Treasury Bill interest rate determined on a quarterly basis and not compounded. Interest can be waived or limited to a specific amount or for a specific time. A penalty of ten percent on delinquent fines and 15 percent on defaulting fines can be imposed or waived for good cause. A notice of default must be sent out within 30 days of any default.

148.   Title 18 U.S.C. § 3013 requires the imposition of a special assessment at the rate of $25 per Class A misdemeanor conviction.

149.   **Guideline Provisions**: The guideline fine range for an offense level of 10 is $2,000 to $20,000. U.S.S.G. § 5E1.2(c)(3).

Restitution

150.   **Statutory Provisions**: Pursuant to 18 U.S.C. § 3663A, the Court is required to order restitution against each defendant who has been found to have committed: a) a crime of violence (as defined in 18 U.S.C. § 16); b) an offense against property (including any offense committed by fraud or deceit); or c) a crime related to tampering with consumer products (18 U.S.C. § 1365) when there is an identifiable victim who suffers a physical injury or

May 8, 2007                              28

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

pecuniary loss. Restitution orders under 18 U.S.C. § 3663A are to be entered without consideration of the defendant's ability to pay except in cases involving offenses against property where the number of identifiable victims is so large as to make restitution impracticable, or if the burden on the sentencing process caused by the determination of complex issues of fact in connection with restitution would outweigh the need to provide restitution to the victim.

151.   **Guideline Provisions:** In the case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss, if such order is authorized under 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, or 3663A; or shall impose a term of probation or supervised release with a condition requiring restitution for the full amount of the victim's loss, if the offense is not an offense for which restitution is authorized under 18 U.S.C. § 3663(a)(1) but otherwise meets the criteria for an order of restitution under that section. U.S.S.G. § 5E1.1(a).

152.   Restitution is owed to the following victim in the amounts specified, to be paid in accordance with instructions issued by the U.S. Probation Office and/or the United States Attorney's Financial Litigation Unit:

       The State of Alaska                                    $17,110

# PART E. FACTORS THAT MAY WARRANT DEPARTURE

153.   The probation officer has not identified any information that would warrant a departure from the guidelines. U.S.S.G. Ch. 5, Pt. K.

# PART F. FACTORS REGARDING THIRD-PARTY RISK

154.   The probation officer has not identified any factors related to third-party risk.

# PART G. STATUTORY SENTENCING FACTORS

155.   The government has not presented any 18 U.S.C. § 3553 sentencing factors to the U.S. Probation Officer.

156.   Defense counsel indicated they plan to address any 18 U.S.C. § 3553 sentencing factors in their sentencing memorandum.

May 8, 2007                        29

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with applicable statutes and established case law.

Presentence Report - Alan J. Veys                                    **DRAFT**

RESPECTFULLY SUBMITTED,

Karen M. Brewer
Chief U.S. Probation Officer

by        <u>S/PAMELA SHAW</u>
          Pamela Shaw
          U.S. Probation/Pretrial Services Officer

Approved:

<u>S/BARBARA D. BURTON</u>
Barbara D. Burton
Supervising U.S. Probation Officer

May 8, 2007                      30

Confidential property of the U.S. Courts submitted for official use of the U.S. Sentencing Commission, U.S. Parole Commission, and Federal
Bureau of Prisons, to be returned upon request. Further disclosure or redisclosure is authorized only to the extent necessary to comply with
applicable statutes and established case law.